875 A.2d 703

MARYLAND STATE BOARD OF EDUCATION, et al.

v.

Keith A. BRADFORD, et al.

No. 85, Sept. Term, 2004.

Court of Appeals of Maryland.

June 9, 2005.

354

Elizabeth Kameen, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of MD, Valerie V. Cloutier and Elliott L. Schoen, Asst. Attys. Gen., on brief), Baltimore, for Appellants/Cross-Respondents.

Elizabeth B. McCallum (Helen K. Michael and Arturo De-Castro of Howrey Simon Arnold & White, L.L.P., Washington, DC; Louis Bogard, Charlottesville, VA; and Susan Goering of American Civil Liberties Union of MD, Baltimore) all on brief; Warren N. Weaver (Ilana Subar of Whiteford, Taylor & Preston, L.L.P., Baltimore; Anthony J. Trotta, Gen. Counsel, Baltimore City Bd. of School Com'rs, Baltimore), all on brief; Ralph S. Taylor, City Sol. (Elizabeth F. Harris, Joshua Auerbach and Christine Wellons, Baltimore), all on brief, for Appellees Cross-Petitioners.

David Sciarra, Executive Dir., Ed. Law Center, Newark, NJ, Molly A. Hunter, Dir., Legal Research, Campaign for Fiscal Equity, Inc./Access, New York City; Gregory C. Malhoit, Counsel for Rural School and Community Trust, Inc., Raleigh, NC; Edward C. DuMont, Christopher Herrling, Susan Demske, Kelly Thompson Cochran, Jenny R. Chou (Admitted in MD), Wilmer, Cutler, Pickering, Hale & Door, L.L.P., Washington, DC; Julie Underwood, Gen. Counsel, Nat. School Boards Ass'n, Alexandria, VA, brief of Amici Curiae The Nat. School Boards Ass'n, Ed. Law Center, Cam-

paign for Fiscal Equity, Inc., Rural School and Community Trust, Inc. in support of Appellees.

Leslie T. Thornton, Asuncion C. Hostin, Reginald B. McKnight, Johnisha Matthews, Dickstein, Shapiro, Morin & Oshinsky, L.L.P., Washington, DC, brief of Amici Curiae, The MD State Conference of NAACP Branches, the MD Latino Coalition for Justice, and MD Caucus of Black School Bd. Members.

Stephen A. Friedman, Cary J. Hansel, Abigail Ross Hopper, Joseph, Greenwald & Laake, P.A., Greenbelt, Amici Curiae brief of Dr. Alvin Thornton, MD. Educ. Coalition, American Ass'n of University Women, and League of Women Voters of MD.

Argued before BELL, C.J., RAKER, WILNER, HARRELL, BATTAGLIA, GREENE and JOHN C. ELDRIDGE (Retired, Specially Assigned), JJ.

WILNER, Judge.

This appeal constitutes the latest skirmish in a decades-long battle by Baltimore City and others to force the General Assembly, in carrying out its mandate under Article VIII of the Maryland Constitution to "establish throughout the State a thorough and efficient System of Free Public Schools [and] provide by taxation, or otherwise, for their maintenance," to increase substantially its funding support for the Baltimore City Public School System. The appeal now before us, by the State, questions, on jurisdictional, procedural, and substantive grounds, the validity of an order entered by the Circuit Court for Baltimore City in August, 2004. We shall conclude that (1) the validity of much that is now being challenged by the State is not properly before us at present, but (2) one aspect of the court's order is before us and is invalid.

## BACKGROUND

In *Hornbeck v. Somerset Co. Bd. of Educ.*, 295 Md. 597, 458 A.2d 758 (1983), which, in a sense, was a precursor to the

present litigation, we traced in some detail the historical development of the public school system in Maryland and the method of funding it; we need not repeat that history here. Suffice it to say that, through legislative enactments by the General Assembly, in furtherance of the mandate of Article VIII, § 1 of the Constitution, the operation and funding of the public school system is, and since its inception in 1864 has been, a joint effort by the State and local governments. The State Board of Education and the State Superintendent of Schools set the overall educational policy of the State and provide general direction and supervisory authority over the system, but, subject to that State direction and authority, it is predominantly the school boards and school superintendents in each of the 23 counties and Baltimore City that operate the public schools. Those subdivisions constitute the school districts of the State.

The funding of the system has also been, and remains, a joint effort between the State and its political subdivisions. In 1979, Baltimore City and three counties filed suit in the Circuit Court for Baltimore City seeking a declaratory judgment that the then-existing system for financing the public schools, which required the counties and Baltimore City to shoulder approximately 46% of the current expenses needed to operate the public schools, violated both Article VIII of the Maryland Constitution and the equal protection guarantees of the Fourteenth Amendment to the U.S. Constitution and Article 24 of the Maryland Declaration of Rights. That was the *Hornbeck* case. The gravamen of the attack in that case was that, because of significant disparities in the wealth of the various political subdivisions, there was an unequal ability to provide the necessary local funding, which resulted in substantial differences among the subdivisions in overall per pupil expenditures. The effect, it was alleged, was to underfund education in some subdivisions and possibly overfund it in others, and that, in turn, created disparities in the quality of the educational program in the subdivisions.

The Circuit Court, believing itself bound by the Supreme Court's decision in *San Antonio School District v. Rodriguez,*

411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), found no violation of equal protection under the Federal Constitution but declared the financing scheme unconstitutional under Article VIII of the Maryland Constitution and Article 24 of the Maryland Declaration of Rights. This Court vacated the Circuit Court decree. With respect to Article VIII, we held that the Constitutional provision did not require uniformity in funding and did not preclude the political subdivisions from providing local funds, in the amounts they deemed adequate, to supplement the level of basic State funding. We said in that regard:

"The development of the statewide system under § 1 [of Art. VIII] is a matter for legislative determination; at most, the legislature is commanded by § 1 to establish such a system, effective in all school districts, as will provide the State's youth with a basic public school education. To the extent that § 1 encompasses any equality component, it is so limited. Compliance by the legislature with this duty is compliance with § 1 of Article VIII of the 1867 Constitution."

*Hornbeck, supra,* 295 Md. at 632, 458 A.2d at 776–77.

We agreed with the Circuit Court that, in light of the Supreme Court's decision in *San Antonio School District,* there was no Federal equal protection violation. As to State equal protection, we concluded that neither Article VIII nor Article III, § 52 of the Maryland Constitution established a fundamental right for equal protection purposes, that the equal protection issue was therefore to be judged under the rational basis test, and that "the legislative objective of preserving and promoting local control over education is both a legitimate state interest and one to which the present financing system is reasonably related." *Id.* at 654, 458 A.2d at 788. Accordingly, we held that the then-current system of public education financing satisfied the rational basis test.

Our Opinion in *Hornbeck* was filed in April, 1983. This case began in December, 1994, when the parents of several students in the Baltimore City School System filed a class action

lawsuit in the Circuit Court for Baltimore City against the State. The action was allegedly on behalf of "present and future students in the Baltimore City Public Schools who are at risk of educational failure." [1] We shall refer to that case as the *Bradford* case, after the name of the lead plaintiff. At-risk students were defined in the complaint as those "who experience circumstances of economic, social, and/or educational disadvantage that substantially increase the likelihood that they will fail to obtain an adequate education in public school." The term was further defined as including students who live in poverty, attend schools with a high proportion of students living in poverty, live with fewer than two parents, have parents who did not graduate from high school, live with parents who are unemployed, are homeless, are themselves parents or pregnant, live under the threat of violence at home, have been retained in grade on at least one occasion, score more than one year below grade level on standardized tests, or have otherwise been determined to be in need of remedial education. The complaint alleged that the "vast majority" of students in the Baltimore City Public Schools—more than 70,000—were in that category and that the percentage of at-risk students in the City was far higher than in any other subdivision of the State.

Although three counts were pled—failure of the State to discharge its obligation under Article VIII of the State Constitution, denial of equal treatment under Article 24 of the Declaration of Rights, and denial of a property interest in an adequate public education under Article 24—the heart of the complaint was that the State had failed to provide resources sufficient to enable the Baltimore City Public Schools (BCPS) to meet, or even make meaningful progress in meeting, con-

---

1. The actual defendants were the State Board of Education, the State Superintendent of Schools, the Governor, and the Comptroller. The Governor and the Comptroller were later dismissed as defendants. For convenience, we shall refer to the State defendants in this action and in the action by Baltimore City, discussed later, collectively as the State. Pursuant to a stipulation, it was agreed that the plaintiffs' proposed class would not be certified in accordance with Maryland Rule 2–231 but that the plaintiffs would be deemed "representative plaintiffs."

temporary education standards, especially with respect to at-risk students, as measured by the level of student outcomes and the availability of educational resources. As relief, the plaintiffs asked, among other things, that the court (1) declare that the State had failed to fulfill its obligation to provide a system of public schools adequate to meet the needs of the schoolchildren in Baltimore City and had violated their right to an adequate education, equal treatment, and due process of law under Articles VIII and 24, (2) order the defendants to work with the plaintiffs and Baltimore City to develop a plan to improve the public schools in the City and to take all steps necessary to implement that plan, and (3) retain jurisdiction to monitor and ensure compliance with any injunctive provisions in its judgment.

In September, 1995, the City filed a separate three-count action against the State. Although it charged that, based on the results of standardized testing, the State had failed to provide an adequate public education anywhere in the State, its principal focus was on Baltimore City's "unique status." In that regard, the complaint noted that the City had the lowest tax capacity among the 24 subdivisions but yet the highest property tax rate, that the burden of local funding was dispro-portionately hard on the City, and that the State's failure to provide adequate funding to the City impacted its ability to recruit, support, and retain teachers and to maintain its physical facilities. The City averred that it was unable to meet contemporary Statewide qualitative educational stan-dards because the State had failed to provide it with adequate resources and assistance, that such failure deprived the chil-dren in the City of their right to receive a basic public school education, and that such deprivation, in turn, infringed on the children's right to free speech and to vote under Articles 40 and 7 of the Declaration of Rights. All of that was under Count I, alleging a violation of Article VIII.

In Count II, the City asserted that, because the State had failed to assess the needs of the City's "discrete student populations (minority, impoverished, and disabled) to ensure that BCPS has the necessary resources to provide a basic

public school education to all of its students," the State was "engaging in discriminatory conduct." Count III alleged that the State's process of "reconstituting" schools that failed to meet State standards violates due process because it "fail[s] to provide local school districts with any process to challenge the arbitrary findings and actions of the State Superintendent or the State Board." [2]

In October, 1995, the State filed a third-party claim against the City, in which it averred that the City had "totally failed to manage adequately the Baltimore City Public School system" and that "[a]ny inadequacies in the education received by the children of Baltimore City are a direct result of that failure and can only be remedied by a total restructuring of the management of BCPS." The State contended that the City had failed to implement a legislatively-endorsed series of recommendations made in 1992 by a consulting firm, that it had failed to use nearly $12 million in Federal and State resources that had been made available to it in FY 1992–1995, that due to lack of planning and management, it had failed to access millions of dollars of additional Federal funds that could have become available, and that it failed to use $20 million of State capital improvement funds because of delays in design work and in signing contracts. The State alleged further that the City had failed to develop and implement a uniform curriculum, an effective personnel training and evaluation system, an adequate management information system, an adequate procurement system, effective testing protocols, effective grants administration and monitoring, a comprehensive plan to reduce school crime, and an adequate plan to comply with the mandates of the U.S. District Court with respect to special education programs then under Federal court scrutiny. As relief, the State asked that the City be held liable for the plaintiffs' claims should they prevail and that the City school system be restructured.

---

2. The City did not explain how, as a political subdivision of the State, it was entitled to due process of law from the State.

The court consolidated the two cases, dismissed the Governor and Comptroller as party defendants in the *Bradford* case, and dismissed Count III of the City's complaint. On October 18, 1996, the court entered a partial summary judgment in the consolidated cases. It found that there was "no genuine dispute of material fact in these cases as to whether the public school children in Baltimore City are being provided with an education that is adequate when measured by contemporary educational standards" and declared, based on the evidence submitted on the partial summary judgment motions, that "the public school children in Baltimore City are not being provided with an education that is adequate when measured by contemporary educational standards." It concluded further, however, that there was a genuine dispute regarding the cause of the inadequate education provided to the City students and the liability therefor. Those issues were reserved for trial.

On November 26, 1996, about a month after the entry of the partial summary judgment, the parties in both cases entered into a Consent Decree that provided, essentially, for five things—a significant restructuring of the governance of the City Public School System, the provision of certain additional funding by the State for FY 1998–2002, the development of a plan to increase student achievement, interim and final review and evaluation of progress, and the continuance of jurisdiction by the court.[3] The decree looked toward a partnership arrangement between the City and the State and recognized

---

3. As noted briefly above, a parallel action, in which the City had been sued for not providing adequate special education programs to children in need of them, was pending in Federal Court. *Vaughn G. v. Mayor and City Council of Baltimore* (Civ. Action No. MJG–84–1911). Judge Garbis, who presided over that case in the U.S. District Court, and Judge Kaplan, who presided over the consolidated cases in the Circuit Court for Baltimore City, had held some joint hearings in the respective cases, and, to a limited extent, the Federal and State cases presented similar issues and were proceeding in tandem. Because the provisions of the Consent Decree in the State actions would impact on issues pending in the Federal action, the parties in the parallel Federal action contemporaneously entered into a Consent Decree in that action. Each Consent Decree was incorporated by reference into the other.

that the implementation of many of its provisions would require legislative approval by the General Assembly. It therefore provided that the decree would not become fully effective until (1) the Governor signed "partnership legislation" in a form that did not affect the substantive rights of the parties established by the decree, and (2) the State Budget for FY 1998 was approved with the additional funds for FY 1998 provided for in ¶ 47 of the decree.

With respect to the restructuring, the parties agreed and the court ordered, through ¶¶ 2 and 8 through 20 of the decree, that the current City Board of School Commissioners be replaced by a new Board of School Commissioners consisting of nine voting members and one non-voting student member. We shall refer to the new board hereafter as "the Board." The nine voting members were to be appointed jointly by the Governor and the Mayor of Baltimore from a list submitted by the Maryland State Board of Education (MSBE). The decree set forth certain qualifications for the voting members, provided a staggered three-year term for them, and established quorum requirements. The new Board was to be vested with full control of all functions relating to BCPS in accordance with the partnership legislation and over all personnel and procurement involving the schools, and was to be "directly accountable for improving the academic achievement of Baltimore City school children as measured by the Maryland School Performance Program" (MSPP). The Board was required to appoint a Chief Executive Officer to serve at its pleasure, who was to be responsible for the overall administration of the BCPS. Provisions were made for other executive officials and for a Parent and Community Advisory Board.

By September, 1997, the Board was to adopt a transition plan to guide the operation of the school system in the 1997–98 school year. By January 1, 1998, the CEO was to present to the Board a Master Plan to increase student achievement, and, after review and public hearings, the Board was required to adopt a Master Plan by March 1, 1998. The Master Plan was to include "a comprehensive design for improvement of

school management and accountability of all personnel" as well as implementation of the key recommendations made in three identified consultant reports. It was to address ten enumerated topics and identify the actions necessary to improve student performance. Paragraph 40 required the Board and MSBE, by July 1, 1999, to select an independent consultant to evaluate the interim progress of reform. The consultant was to report the results of its evaluation by April 30, 2000. Paragraph 42 required the Board and MSBE, by January 1, 2001, to select an independent consultant to conduct a final comprehensive review and evaluation of BCPS. The final report was to examine the extent of progress made in improving the schools, cover all of the topics examined in the interim evaluation, and was to be made by December 1, 2001.

The financing provisions were contained in ¶¶ 43–54. Paragraphs 43, 47, and 48 obligated the State to provide additional funding to the City public school system, subject to appropriation by the General Assembly, as follows: (1) for operating expenses, $30 million for FY 1998 and $50 million for each of FY 1999, 2000, 2001, and 2002; and (2) through the State School Construction Program, at least $10 million in each of FY 1998 through 2002, subject to a 10% match by the City. The additional operating funds required under ¶ 47 were to be used (1) to improve educational performance in schools having a high percentage of students living in poverty, in reconstitution-eligible schools, and in other schools that failed to meet MSPP standards, (2) to make progress in meeting teacher salary parity with Baltimore County, and (3) to implement certain other enumerated improvements.

Paragraph 52 of the decree permitted the Board, for FY 1999 through 2002, to request from the State, through the State Budget process, funds in excess of those required under ¶ 47 if the Board presented a detailed plan showing why the additional funds were needed and how they would be spent. The State agreed to use its best efforts to satisfy such a request, subject to availability of the funds. Paragraph 53 provided, in addition, that, for FY 2001 and 2002, the Board could request funds in excess of those required under ¶ 47

*after completion of the interim evaluation described in ¶ 40.*[4]
(Emphasis added). If such a request was made, the *Bradford*
and *Vaughn* plaintiffs were to have an opportunity to present
their views to the Board and the State and the State and the
Board were given from April 30, 2000 to June 1, 2000 to
negotiate regarding the request. If no agreement was
reached, the Board was authorized to seek relief from the
Circuit Court. In that event, the matter was to be placed on
an expedited schedule, with a hearing commencing no later
than 15 days after the filing of a motion for relief. The State
expressly reserved "all of its defenses as to any Court order
for such funds in amounts greater than those provided in
paragraph 47." Paragraph 53 concluded, in relevant part,
with the provision that:

> "Any party may appeal the Circuit Court's ruling to the
> Court of Appeals, but the *Bradford* Plaintiffs may appeal
> only if the Board appeals. The Circuit Court shall stay any
> order pending appeal, and the parties shall jointly request
> expedited consideration of the matter by the Court of
> Appeals. The partnership legislation shall include statutory
> authority providing for direct review by the Court of Ap-
> peals of Maryland and requesting that the Court of Appeals
> of Maryland issue a decision within 60 days after briefing is
> completed."

Paragraph 68 provided that the decree would remain in
effect through June 30, 2002, unless the court extended the
term on timely motion of a party and a showing of good cause.
Paragraph 69 provided that the court would retain continuing
jurisdiction during the term of the decree to monitor and
enforce compliance with it and that any party could seek to
enforce its terms. That paragraph also stated that, notwith-
standing termination of the decree, the court retained jurisdic-

---

4. The decree actually referenced ¶¶ 38 and 39, but the interim evalua-
tion was provided for in ¶ 40. Paragraphs 38 and 39 do not provide for
or even mention that evaluation. We assume that the reference to
those paragraphs was a typographical error.

tion to resolve any disputes that arose during the term of the decree.

In its next session, the General Assembly enacted 1997 Md. Laws, ch. 105, that, although not entirely consistent with the terms of the Consent Decree, the parties agreed was sufficiently consistent to make the decree effective. The statute did not provide for any direct appeal to the Court of Appeals. Two years later, by 1999 Md. Laws, ch. 601, the Legislature created a Commission on Education, Finance, Equity, and Excellence to review the current education financing formulas and accountability measures and make recommendations with respect to certain enumerated subjects. The Commission, which has become known as the Thornton Commission after its chairman, Alvin Thornton, was to make an interim report by January 1, 2000 and a final report by October 15, 2000.

At some point, apparently in the spring of 1999, the Board and MSBE jointly selected Metis Associates, Inc. as the consultant to prepare an interim report, pursuant to ¶ 40 of the Consent Decree. That interim report was rendered on February 1, 2000. Long before that report was filed—even before Metis began any substantial work—the *Bradford* plaintiffs and the Board began working on a proposal for additional funding. That process began in May, 1999 and continued throughout the summer and fall. On December 9, 1999, the Board presented "Building on Success: A Remedy Plan to Address Continuing Funding Needs of the Baltimore City Public School System," in which it concluded that an additional $265 million was required annually for instructional programs and an additional $133 million was required annually for capital improvements. Apparently recognizing that an infusion of that magnitude was not likely to happen all at once, the Board created certain priorities and asked, for FY 2001, for an additional $49.7 million for instructional programs and an additional $40 million for capital improvements.[5]

---

5. The $265 million was broken down into $62.3 million to increase instructional time; $16.7 million to expand the instructional curriculum in the areas of art, music, physical education, and foreign lan-

On February 1, 2000, Metis Associates, Inc., the consultant jointly selected by the Board and MSBE, submitted a lengthy interim evaluation of BCPS, for the 1998–99 school year. The evaluation reported meaningful progress in some areas, less progress in others. Of particular importance here is that, based on a January, 2000 study of BCPS by the Council of the Great City Schools, which compared the funding of BCPS to that in other major cities and in other Maryland subdivisions, Metis concluded that an "adequate" per pupil expenditure was "approximately $10,274." That amount, it said, "represents the amount per pupil [BCPS] would need [in order] to have resources equivalent to the highest performing school districts in the State, after adjusting for student needs." Metis found that the average per pupil expenditure in Baltimore City in 1998–99 was $7,576, and that, to reach the optimal $10,274, an additional $2,698 was necessary. The consultant recommended that the Board seek that additional funding.

After negotiations proved unsuccessful, the Board, in June, 2000, filed a petition pursuant to ¶ 53 of the Consent Decree, in which it asked the court to declare that "the Baltimore City public schools need additional funding of approximately $260 million for educational operating expenses each school year, as

---

guage; $4.8 million to supplement library resources; $3.5 million to increase allocations for materials and supplies; $0.15 million to expand extra-curricular activities; $43 million to expand kindergarten and pre-kindergarten programs; $36.3 million to create smaller learning environments; $20 million to enhance instructional technology; $22.4 million to expand offerings for disruptive students; $4.9 million to develop twilight schools to reduce the number of dropouts; $11.3 million to increase student support services; $44.8 million to enhance professional development; $12.3 million to expand teacher recruitment and retention efforts; and unspecified amounts to enhance high school and middle school reform. The $49.7 million consisted of $4.2 million to recruit and retain teachers; $3.2 million for professional development; $12 million for summer remedial programs; $5 million for kindergarten and pre-kindergarten programs; $5.4 million to prepare high school students to pass the State standardized tests; $3.6 million to prepare middle school students for "rigorous high school pursuits"; $4.5 million for additional psychologists, social workers, and counselors; $0.95 million for instructional leadership; $6.75 million for enriched instructional curriculum; and the balance for instructional technology.

well as approximately $600 million in additional capital funding over a reasonable period of time to correct serious deficiencies in the school system's facilities...."

After an extensive evidentiary hearing, the court, on June 30, 2000, filed a Memorandum Opinion and accompanying Order. In its Order, the court, after referencing its 1996 determination that the State was not providing the children of Baltimore with a Constitutionally adequate education when measured by contemporary educational standards, declared that still to be the case. It declared as well that the State had "failed to make the statutorily mandated best efforts to provide even a reasonable downpayment on the additional approximately $2,000 to $2,600 per pupil that is needed to provide the children of the [BCPS] with a Constitutionally Adequate Education when measured by Contemporary Educational Standards." In furtherance of that finding, the court declared that "the State's allocation of $19.9 million for 2001 and the allocation of $23.9 million for 2002 out of a $940 million budget surplus in Fiscal Year 2001 is not making a 'best effort' out of the available funds" and would not enable the Board to provide the City's school children with a constitutionally adequate education. The final provision in the Order was essentially hortatory. The court declared that, having found that the State was not fulfilling its obligation under Article VIII, "the Court trusts that the State will act to bring itself into compliance with its constitutional and contractual obligations under the Consent Decree for Fiscal Years 2001 and 2002 without the need for Plaintiffs to take further action."

The State noted an appeal from that Order, and we granted *certiorari* prior to proceedings in the Court of Special Appeals. In its brief, the State argued that (1) the Circuit Court had no authority to determine either the liability for the Constitutional inadequacy of the City school children's education or the amount of funds required from the State, under either the Consent Decree or under the doctrine of separation of powers, and (2) the court's order was clearly erroneous. In its first argument, the State contended that the court exceeded the scope of the Consent Decree when it determined that

the State was obliged to increase its annual funding of the City school system by $200 to $260 million ($2,000 to $2,600/pupil times an estimated 100,000 pupils) and that the effect of its ruling was an order to the Governor and General Assembly to appropriate the necessary funds, which the court had no Constitutional authority to do. In its second argument, the State complained that the court ignored the evidence and argument it presented and that the court's finding that the State did not use its best efforts to obtain the additional funding requested by the plaintiffs was erroneous. A week before oral argument, the parties jointly requested that the argument be postponed. We denied that request, whereupon the State dismissed its appeal.

In December, 2001, Westat, the consultant selected pursuant to ¶ 42 of the Consent Decree to render a final evaluation, made its report. In contradiction to findings later made by other panels, Westat found significant improvement in almost all categories. It concluded that the Board was providing strong leadership in improving "what, by all criteria, was an educational system beyond the brink of failure" and had begun to establish a coherent administrative and management structure. It found that many new initiatives had been put in place, "although few could be considered fully tested or established." With respect to funding, Westat found that per pupil expenditures in BCPS "are now approaching $10,000"—the amount that Metis had determined would be adequate—of which about 25% was from local sources. In comparison with other similar cities, Baltimore ranked about in the middle— ahead of Milwaukee, Cleveland, and Indianapolis, but behind Pittsburgh and Newark. Westat noted the difficulty in attempting to define "adequacy" or "sufficiency" in education funding. The meanings of those words, it said, keep changing and were "buffeted about by three dynamic processes: the efforts of advocacy groups to establish a use of the term favorable to their interests; the efforts of technicians to construct workable quantitative measures for the terms with available data and analytic techniques; and a growing number

of court cases with judges struggling to find workable legal definitions."

The next significant event occurred a month later, in January, 2002, when the Thornton Commission issued its final report on statewide education funding in Maryland. Employing two methodologies to determine the amount of additional funding that would be necessary to fill each school district's "adequacy gap"—the difference between actual funding and needed funding—the Commission found that BCPS required additional funding of between $ 2,938 to $4,250 per pupil, translating to an aggregate sum of between $290 million and $420 million. The Commission also made several recommendations for improving school funding statewide.

The Legislature considered the Commission's findings and recommendations in its 2002 Session and, through the enactment of 2002 Md. Laws, ch. 288, which it named the "Bridge to Excellence in Public Schools Act," it provided for the eventual implementation of many of those recommendations. The 87–page Act restructured many of the State aid formulas and programs and provided for a phased increase in State educational funding for all 24 subdivisions from FY 2003 to FY 2008. According to the Fiscal Note that accompanied the bill, State aid to the local school systems would increase by nearly $148 million in FY 2004, $364 million in FY 2005, $639 million in FY 2006, $948 million in FY 2007, and $1.3 billion in FY 2008. For the six-year phase-in period, Baltimore City would receive $375.2 million more than it received in FY 2002, an increase of 64%.[6]

In May, 2002, following the enactment of ch. 288, the Board and the *Bradford* plaintiffs filed a joint motion asking the court to continue its judicial supervision "until such time as the constitutional inadequacy of the education provided by [BCPS] has been remedied." They noted that the judicial

6. The annual increases over FY 2002 funding for BCPS were estimated as follows: FY 2003 $18.7 million; FY 2004 $28.1 million; FY 2005 $68.9 million; FY 2006 $125.5 million; FY 2007 $187.6 million; and FY 2008 $258.6 million.

supervision provided in the 1996 Consent Decree was due to terminate on June 30, 2002, that the Constitutional deficiency found in 1996 and 2000 still existed, and that, because the General Assembly had not identified a revenue source for a large share of the increases provided for in ch. 288, there was some uncertainty as to whether those increases would, in fact, be fully funded. Finding that to be the case, the court, by order entered June 25, 2002, determined that it would retain jurisdiction and continue judicial supervision "until such time as the State has complied with this Court's June 2000 order." No complaint was made at that time about the validity of the phase-in approach.

The next relevant event occurred in March, 2004, when Judges Kaplan and Garbis signed an order in their respective cases directing the City, the Board, and the State defendants to provide the court, by April 7, 2004, with their plans for the funding and fiscal management of BCPS. The plans were to address certain specific topics, including the amount of the BCPS deficit and projected cash flow gaps, cuts in program and personnel reductions, source of funds, including loans, for current operations and loan repayments, and anticipated cash flow problems and planned solutions.

In response to that directive, the City and the Board informed the two judges that BCPS had ended FY 2002 with a deficit of $21 million, it ended FY 2003 with a $37 million deficit, and that the cumulative deficit was therefore $58 million. They noted that the Board had anticipated a $21.6 million surplus for FY 2004, which it planned to use to reduce the deficit, but that, for the first quarter of FY 2004, it overspent its budget for personnel costs by $24 million, and that, if immediate action was not taken, the cumulative deficit could grow by that amount. The City and Board advised the judges of their plan to adopt a budget for FY 2005 that would reduce the accumulated deficit by 60% ($35 million) and to adopt a budget for FY 2006 that would eliminate the remaining 40% ($23 million).

Apart from this "structural" deficit, the Board also faced a cash flow shortfall for FY 2004 of $42 million. On March 17, 2004, they said, the Board and the City entered into a City Funding Agreement under which the City lent the Board $42 million to deal with the cash flow deficit, $34 million of which was to be repaid in August, 2004 and the balance of $8 million in June, 2006. The Board was expecting an $85.6 million payment from the State on July 31, 2004, and it intended to use some of those funds to make the $34 million partial repayment.

In the funding agreement, the parties agreed that a three-person Fiscal Operating Committee, appointed by the Mayor, would be created to develop and implement a financial recovery plan by May 30, 2004. That plan was to include, among other things, a new internal budgetary process, a schedule for reducing the structural deficit, further cost-savings measures, and "an affordable, downsized staffing model for [BCPS]."

The Fiscal Operating Committee made its Report to the Board on May 30, 2004. It attributed the accumulated deficit to budgeted personnel vacancies that never materialized, reduced class sizes, expanded summer school, enhanced classroom assistance, and transportation contract cost overruns. It noted that the FY 2004 plan to reduce the deficit not only could not be implemented but that an additional deficit was looming because (1) budgeted personnel costs were based on estimated salaries that did not reflect actual salaries, (2) previously promised re-engineering efforts were never completed, (3) temporary employees were not laid off when projected, (4) staff initially paid through grants were absorbed by general funds when the grants expired, and (5) monthly cost reporting lagged months behind. To meet the problem, various cost-saving efforts were immediately put into place, mostly involving a reduction in staff, including what appeared to be non-essential staff—"non-essential temporary employees" and "surplus teachers and administrators." In what it termed "A Roadmap to Financial Recovery," the Committee observed that, "[p]ut simply, [BCPS] must not only continue to cut and contain costs in the remaining months of FY 2004 and plan to

live within its means, it must also produce future year surpluses that will equal or exceed the cumulative deficit that it will carry forward at the end of the current fiscal year."

In July, 2004, a separate panel appointed by MSBE to investigate the BCPS deficit made its report. The panel noted several erroneous assumptions on the part of the General Assembly in the enactment of ch. 288 itself, including an overestimate of what BCPS could do on its own, an underestimate of what the City would continue to do to assist BCPS, failure to focus on the development of oversight by the State Department of Education, and failure to maintain any meaningful follow-up or initiate corrective action when deficiencies were identified. The "makings of a disaster," it said, were there from the beginning, including no continuity of leadership in BCPS (four CEOs, three CFOs, and at least two CAOs in six years), no system of internal communication, no discipline, no meaningful oversight, a sense in middle management that new initiatives need not be followed because senior management would change, no accountability, and no sanctions for failure to perform. There was strong pressure to increase academic achievement without anyone focusing on the entire system and its budget issues. The panel concluded that, "[i]n a system with almost a complete lack of consequence for overspending, the surprise is that the deficit is not even larger." A similar critique of BCPS management, along with positive recommendations for improvement, was rendered by The Greater Baltimore Committee and The Presidents' Roundtable, which had been requested by the Mayor of Baltimore and the president of the Board to review BCPS's budget process and fiscal management practices.[7]

---

7. There was general agreement among all of the groups that studied the fiscal affairs of BCPS that there were serious and systemic management deficiencies, some of long standing, that were simply never addressed. Programs were put into place without regard to the lack of available funding; funds that were, or could have been made available were never used because of mismanagement and inattention. Painful but necessary decisions—layoffs, etc.—were either deferred or simply not implemented. Some of the problems arose when the new board assumed control pursuant to ch. 288. Prior to that time, the City

While the City's Fiscal Operating Committee, the MSBE panel, and the Greater Baltimore Committee were analyzing and attempting to deal with the BCPS deficit and management deficiencies, the General Assembly, obviously concerned about school budget deficits, enacted 2004 Md. Laws, ch. 148, which it called the Education Fiscal Accountability and Oversight Act of 2004. Part of that Act was a new § 5–114 added to the Education Article, which required each local school superintendent to file a biannual report on the financial status of the local school system and required the State Superintendent of Schools to monitor the financial status of each local school system and to make a biannual report to the Governor and Legislature.

Section 5–114(e) provided that a local school system may not carry a deficit as reported in the annual audit of its financial transactions and accounts required under § 5–109 of the Education Article. The term "deficit" was defined as "a negative fund balance in the General Fund of 1% or more of General Fund revenue at the end of the fiscal year." If a deficit was reported, the State Superintendent was required (1) to notify the Governor, the General Assembly, and the appropriate county government, and (2) among other things, to require the local school system to develop and submit for approval a corrective action cost containment plan within 15 days and to file monthly status reports demonstrating action taken to close the deficit. If the local school system failed to comply with those requirements, the State Superintendent, with the approval of the State Board of Education, was to notify the State Comptroller who, in turn, was to withhold 10% of each installment of State funds payable to the local school system until compliance was effected.

Apparently recognizing that it would be impracticable to immediately apply the prohibition against deficits to Baltimore

---

Government handled some of the fiscal matters for the school system, but that ended when the new board was appointed. The management staff appointed by the new board seemed incapable of discharging those responsibilities.

City, which then was reporting at least a $58 million deficit, the Legislature provided, in an uncodified § 4 of the Act, that "[n]otwithstanding § 5–114(e) of the Education Article, the Baltimore City Board of School Commissioners shall eliminate the general fund deficit as reported in the annual audit required by § 5–109 of the Education Article by no later than the fiscal year ending June 30, 2006." That provision, which was consistent with the plan adopted by the Mayor's Fiscal Operating Committee and with the City/Board's April 7, 2004 representation to Judges Kaplan and Garbis, effectively gave Baltimore City one year more than was given to the 23 other local school systems to eliminate any deficit it might be carrying. Ch. 148 took effect July 1, 2004.

A week later, on July 8, the *Bradford* plaintiffs filed a motion complaining that the BCPS plan to eliminate the deficit and repay the loan obtained from the City would reduce the educational opportunities available to the City students. They noted that, to obtain the funds needed to reduce the deficit, BCPS planned to eliminate systemic summer school for at-risk children in elementary and middle schools, increase class size, eliminate guidance counselors and other specialists, and encourage the retirement of skilled teachers. Accordingly, they asked the court to direct the State, the City, and BCPS to "revisit their plans to address the fiscal crisis to make certain that the funds available to educate students in the 2004–05 school year are sufficient to ensure continued progress in the direction of that remedy." In an accompanying memorandum, they disclaimed any notion that the court should "directly involve itself in finding solutions to the fiscal problems, rewriting the budget, or directing specific programs to which funds should be channeled," but suggested a number of ways in which sufficient funds would become available. Among the suggestions were that the State accelerate the phase-in of additional funding under ch. 288 (the Thornton funding), that the City "relax" the requirement that the Board repay $34 million of the $42 million loan in August, 2004, and that the parties "alter" BCPS's plan to eliminate its structural deficit within two years. The Board endorsed that motion.

The State responded with a motion seeking a declaration that State aid, as provided in ch. 288 "satisfies the constitutional standard of adequacy" and that the court order such additional restructuring of BCPS "in order for the system to function efficiently and effectively." In furtherance of its first request, the State noted that the February, 2000 Metis Report concluded that BCPS needed an additional $2,000–$2,600 per pupil over what it received in FY 1999, and it advised that, for FY 2005, State aid alone had increased over the FY 1999 level between $2,360 and $2,478 per pupil. If increases in local and Federal funding were considered, BCPS would receive in FY 2005 approximately $3,400/pupil more than it received in FY 1999.

The State argued that the funding formula adopted in ch. 288, when coupled with other sources of funding, would lead to Constitutional adequacy throughout the State and that the court was not authorized to direct a specific funding level. It pointed to a 2004 report by Ernst & Young indicating that systemic management deficiencies still existed in BCPS and that, for the period 2001–2004, it had failed to avail itself of over $13 million of available State and Federal funds. The State defended BCPS's plans to repay the City loan in accordance with its agreement and to eliminate the structural deficit by 2006. It argued that § 4 of ch. 148 had a rational basis and was Constitutionally valid.

Following a four-day evidentiary hearing, the parties submitted proposed findings of fact to the court. On August 20, 2004, the court filed a lengthy memorandum opinion and accompanying order. In the memorandum opinion, the court adopted most of the proposed findings submitted by the plaintiffs and virtually none of those proposed by the State. After reciting much of the history of the case and the various orders it had entered, the court found, among other things, that:

(1) the estimates that undergirded the Thornton Commission recommendations, largely adopted in ch. 288, were too low;

(2) the increases actually received by BCPS under ch. 288 were less than those projected when the law was enacted;

(3) full funding under ch. 288 would not occur until FY 2008;

(4) BCPS needs substantial additional resources;

(5) the State had "not yet come close to complying with the Court's June 2000 direction that an additional $2,000 to $2,600 per pupil be provided";

(6) the additional $2,000 to $2,600 was to be on top of what was provided in FY 2001 and FY 2002, not FY 1999, and on top of mandated increases, and the additional funding since FY 2002 was only $1,353/pupil;

(7) for FY 2001 through 2004, the State underfunded BCPS by $439.4 million to $834.7 million (depending on whether $2,000 or $2,600 was used);

(8) academic achievement among City students remained grossly unsatisfactory; [8]

(9) consistent with its obligations under both § 4 of ch. 148 and its own commitment to Judges Kaplan and Garbis, the Board determined to institute cost savings sufficient to retire 60% of the $58 million deficit in FY 2005 and the remaining 40% in FY 2006; and

(10) to achieve that result, the Board instituted certain cuts to educational programs and services which the court described in some detail and which it concluded "will immediately and adversely affect the quality of education being provided

---

8. Among the facts found in this regard were that 2003 scores on the Maryland School Assessment Test show that nearly two-thirds of Baltimore City tenth grade students did not adequately read or comprehend grade level reading material and that from 58% to 89% of City students, depending on grade, were functioning at an unsatisfactory level in mathematics; City pupils' performance on high school assessment tests "also demonstrate a substantial failure to meet state standards"—only 20.7% passed the algebra exam and only 26% passed the biology exam; City pupils' dropout rate hovered close to 11% and thus substantially exceeded the State standard (3%); absenteeism remained a large problem—on any given day, one out of five students was not in class; and City suspension and expulsion rates were the highest in the State.

to children in Baltimore City" and "create[ ] significant morale issues both within the system and among the parents and students it served."

In announcing its conclusions of law, the court said that it was "gravely concerned" that the measures taken by the State, the City, and the Board to address the structural deficit "have compromised the quality of education being provided to Baltimore City's schoolchildren" and that this was compounded by the State's unwillingness to provide "immediate funding in accord with this Court's final 2000 order and will not arguably comply with that order until 2008 when full funding under the *Bridge to Excellence Act* is received." To that end, the court, in its accompanying order:

(1) Declared that the Constitutional violation that the court found to exist in 1996 and 2000 "is still continuing" and that full compliance with the 2000 declaration and funding sufficient for BCPS to achieve Constitutional adequacy will not occur until BCPS receives at least $225 million in additional State funding under ch. 288, at the latest by FY 2008.

(2) Declared that the City children should not have to wait another three years for adequate funding and that "[g]iven the substantial underfunding of [BCPS], the Court declares that it would be appropriate for the State to accelerate increases in full Thornton funding to [BCPS]. The Court will not, in any event, tolerate any delays in full Thornton funding for [BCPS] beyond FY 2008."

(3) Declared that, "[t]o ensure that the necessary funding is available for [BCPS] to provide the basic educational programs that have been reduced," the requirement in § 4 of ch. 148 "that the [BCPS] deficit must be eliminated by the end of fiscal year 2006 is unconstitutional as applied to [BCPS]" and that the comparable provision in the City Funding Agreement that the BCPS deficit be eliminated by the end of FY 2006 "is null and void as against public policy." [9] Coupled with that declaration, the court directed that

---

9. We are unable to find any requirement in the City Funding Agreement, which the court referred to as an MOU, directing that the deficit

"Absent additional funding from the State of Maryland, [BCPS] shall not retire the deficit before fiscal year 2008 and [BCPS] shall not dedicate more than $5 million per year toward the creation of a $20 million cash reserve."

(4) Declared that, notwithstanding the court's abrogation of the requirement that the deficit be eliminated by 2006, "the City shall be repaid the remaining $8 million of its $42 million loan as scheduled." [10]

(5) Noted that a number of steps taken to address the financial crisis—elimination of a systemic summer school program, increases in class size, reduction of experienced teachers, mentors, and coaches, and elimination of guidance counselors—reduced educational opportunities and impermissibly interfered with progress toward providing a Constitutionally adequate education, and declared, in light of that circumstance that

"[T]he parties should ensure that educational opportunities for the school children are not reduced, by making available to the children of Baltimore City at least the amount of funding representing the savings achieved from those reduced educational opportunities described above, to be spent solely on programs and services that benefit at-risk children. The Court further declares that that amount constitutes at least an additional $30–45 million in operating funding this fiscal year.

\* \* \*

The Court believes that the best way to accomplish this goal would be for the parties with revenue raising capacity

---

be eliminated by 2006. The Agreement required the financial recovery plan adopted by the Fiscal Operating Committee—a committee appointed by the Mayor—to include a schedule for the reduction of the structural deficit. The plan to eliminate 60% of the deficit in FY 2005 and the remaining 40% in FY 2006 was part of that plan.

**10.** Notwithstanding the dire circumstances found by the court, the Board repaid the first installment of $34 million on the $42 million loan in August, 2004, as it had agreed to do. The court seemed to have no problem with that repayment or with the Board's plan to repay the remaining $8 million in June, 2006.

(the State or City) to increase the funding available to [BCPS] for the upcoming year."

(6) Declared that the court would retain jurisdiction to ensure compliance with its orders and mandates and continue monitoring funding and management issues until full funding is received, at which time the court would revisit the issue of its continuing jurisdiction and determine whether the Consent Decree "should then be extended for good cause."

(7) Ordered the City to continue monitoring BCPS financing and accounting and ensure that expenditures do not exceed revenues, but enjoined the City not to impose any budget cuts or to restrict program funding.

(8) Having issued those declarations, expressed the trust that the parties would "act in good faith and with all deliberate speed to ensure compliance without the necessity of further action by the court."

The State appealed, and we granted *certiorari* prior to proceedings in the Court of Special Appeals. The State has raised four issues and the plaintiffs have raised three. They can be restated as follows:

(1) Is the August, 2004 order, or any part of it, presently appealable and, if so, on what basis;

(2) If the order is appealable, in whole or in part, what issues are properly before us at this point; and

(3) To the extent one or more issues are properly before us, did the Circuit Court err?

## DISCUSSION

### *Appealability*

■ We have, on a number of occasions, articulated and confirmed the rule that the right to seek appellate review of a trial court's ruling ordinarily must await the entry of a final judgment that disposes of all claims against all parties, and that there are only three exceptions to that rule: appeals from interlocutory orders specifically allowed by statute, predomi-

nantly those kinds of orders enumerated in Maryland Code, § 12–303 of the Cts. & Jud. Proc. Article; immediate appeals permitted under Maryland Rule 2–602(b); and appeals from interlocutory rulings allowed under the common law collateral order doctrine. *See Smith v. Lead Industries Assoc., Inc.,* 386 Md. 12, 21, 871 A.2d 545, 550–51 (2005); *Frase v. Barnhart,* 379 Md. 100, 109–10, 840 A.2d 114, 119 (2003); *Shoemaker v. Smith,* 353 Md. 143, 165, 725 A.2d 549, 560–61 (1999).

The State initially sought to treat the question of appealability, which, of course, is a critical, threshold one, in a brief footnote:

"The circuit court's order is appealable because it is a final declaratory judgment on the matters presented to it in August 2004. Declaratory judgments are final judgments. Md. Jud. Proc.Code Ann. § 3–411. Further, to the extent that the court's order is in the nature of an injunction, it is immediately appealable. *See* Md. Cts. & Jud. Proc.Code Ann., § 12–303; *Funger v. Mayer [Mayor],* 244 Md. 141, 149, 223 A.2d 168 (1966)."

In response to the *Bradford* plaintiffs' motion to dismiss the appeal, the State decided to pay somewhat more attention to the question. In its reply brief, it urges that the Circuit Court's attempt to enforce the Consent Decree "far exceeded its subject matter jurisdiction" in that "[i]t had no authority to summon parties to court to address the [BCPS] budget deficit, to direct the parties, including the defendants, to file pleadings; or to craft an order that went far beyond anything the Consent Decree contemplated or authorized." Relying upon *Waters v. Smith,* 277 Md. 189, 196, 352 A.2d 793, 797 (1976) and *Cohen v. Willett,* 269 Md. 194, 195, 304 A.2d 824, 825 (1973), it avers that "[a]n appeal lies immediately from an order which exceeds the jurisdiction of the trial court." The State also supplemented its footnote with the assertion that "[b]ecause the parties only requested declaratory relief and because ... the declaratory judgment issued in August 2004 addressed all requests for such relief, it is a final appealable judgment."

Although, for reasons to be explained, we shall conclude that one aspect of the court's order was in the nature of an injunction that was immediately appealable under § 12–303 of the Cts. & Jud. Proc. Article, we find no merit whatever in the alternative bases urged by the State.

There is a line of cases, commencing with *Gottschalk v. Mercantile Trust Co.*, 102 Md. 521, 62 A. 810 (1906), and *Eastern States Corp. v. Eisler*, 181 Md. 526, 30 A.2d 867 (1943) and extending through *Montgomery Co. Coun. v. Kaslow*, 235 Md. 45, 51, 200 A.2d 184, 187 (1964), *Cohen v. Willett*, and *Waters v. Smith*, both *supra*, in which this Court has indeed indicated that an immediate appeal may lie from an order that is jurisdictionally deficient.

■ That view has long been discarded. In more recent times, as noted above, we have made clear that there are only three exceptions to the final judgment rule, and a mere allegation that an interlocutory order exceeded the subject matter jurisdiction of the court is not one of them. In *Gruber v. Gruber*, 369 Md. 540, 547, 801 A.2d 1013, 1017 (2002), we held flatly that "a trial court's order denying a challenge to its jurisdiction is a nonappealable interlocutory order." We have similarly discarded the once-held view that an immediate appeal would lie from an order denying a Constitutional right. *Compare Smith v. Fredericktown Bank*, 258 Md. 141, 142, 265 A.2d 236, 237 (1970) with *Parrott v. State*, 301 Md. 411, 483 A.2d 68 (1984); *see also Old Cedar v. Parker Construction*, 320 Md. 626, 631–32, 579 A.2d 275, 278 (1990).

A contrary approach would be wholly inconsistent with the very purpose of the final judgment rule, which is to avoid piecemeal appeals that create inefficiencies in both the appellate and trial courts. The mere allegation that a clearly interlocutory order is jurisdictionally deficient should not serve to halt proceedings in the trial court while an appellate court considers whether the allegation has merit. Moreover, there is no need for a fourth exception to the final judgment rule. In some instances, an order that is jurisdictionally deficient may, for other reasons, be immediately appealable as

a final judgment, under the collateral order doctrine, or under § 12–303, but if it is not, it can certainly be reviewed in an appeal from the final judgment.[11]

The State's assertion that any declaration by a court constitutes a final judgment is patently without merit. It is true that when, in a declaratory judgment action, the court enters a judgment declaring the rights of the parties and that judgment resolves all of the issues in the case, it is appealable, but that is because it constitutes a final judgment in the case. The fact that, as here, a court, in the course of its continuing jurisdiction in a case, makes pronouncements or declarations of one kind or another does not, of itself, imbue those pronouncements or declarations with the status of final judgments.

There clearly has been no final judgment in this case. The case is very much alive in the Circuit Court. Indeed, in its August 20, 2004 order, the court has actually done very little of any immediate effect. It declared that the school children in Baltimore City, as of August, 2004, were being deprived of their right to a thorough and efficient education. That determination is certainly subject to challenge if and when a final judgment is entered, if it is still relevant at that time. The court declared that the Constitutional violation would exist until BCPS receives at least $225 million in additional annual aid from the State. That, too, can be challenged, either when a final judgment is entered or at such time as the court attempts to implement that finding by an order that is properly appealable on an interlocutory basis. The court declared that "it would be appropriate" for the

---

11. The appeal in *Cohen v. Willett*, for example, was from an order, in a judicial review action, remanding the case to the administrative agency for further proceedings, the challenge being that the court had no power to enter such an order. In subsequent cases, we have held that such an order is appealable as a final judgment. *See Department of Public Safety v. LeVan*, 288 Md. 533, 542–43, 419 A.2d 1052, 1057 (1980); *Schultz v. Pritts*, 291 Md. 1, 5–6, 432 A.2d 1319, 1322 (1981); *Md. Comm'n on Human Rel. v. B.G.&E. Co.*, 296 Md. 46, 52–3, 459 A.2d 205, 210 (1983).

State to accelerate the phase-in of additional funding provided in ch. 288. That is hardly an appealable order. The court decided to retain jurisdiction to continue monitoring funding and management issues. Until the court does something in the exercise of that jurisdiction that is otherwise appealable, however, there is clearly nothing final about that provision.

■ In ¶¶ 8 and 9 of the order, the court declared that the parties "should ensure continued progress towards constitutional adequacy" by making available to the children of Baltimore City at least $30 million to $45 million from the savings achieved from earlier reductions in programs and that "the best way to accomplish this goal would be for [the State and the City] to increase funding available to [BCPS] for the upcoming year." It is not clear to us whether the State or the City have done anything in response to that suggestion, but those statements by the court do not order anyone to do anything. The directive that the City continue to monitor the BCPS finances may be considered injunctive in nature, but the City has not appealed from that directive and it does not obligate the State to do anything.

■ As we view the August, 2004 order, only two aspects of it are appealable at this time. Paragraph 12 orders that the City be repaid the $8 million balance of its loan as scheduled. In both form and substance, that constitutes an order for the payment of money, which is appealable under § 12–303(3)(v), and although that directive seems facially incompatible with the court's ruling regarding the elimination of the $58 million deficit, the State has not complained in this appeal about that directive.

■ The second aspect, about which the State *does* complain, are (1) the declaration in ¶ 10 of the order that § 4 of ch. 148 is unconstitutional, (2) the associated declaration in ¶ 11 that the contractual obligation of BCPS to eliminate the deficit by FY 2006 is null and void as against public policy, and (3) the implementing directive, found in ¶ 13 of the order, that, absent additional funding from the State, BCPS "shall not retire the deficit before fiscal year 2008 and [BCPS] shall not

dedicate more than $5 million per year toward the creation of a $20 million case reserve." That directive, which proceeds from the declaration of unconstitutionality and contravention of public policy, is injunctive in nature, in that it forbids BCPS from taking action that, by public general law, the General Assembly has required BCPS to take and that, by contract freely entered into with the City, it agreed to take. That directive is immediately appealable under § 12–303(3)(i), and, along with its underpinnings in ¶¶ 10 and 11, are the only aspects of the August 20, 2004 order that are properly before us at this point.

### *Validity of That Directive*

 Declaring a statute enacted by the General Assembly to be unconstitutional and therefore unenforceable is an extraordinary act. Statutes are generally presumed to be Constitutional and are not to be held otherwise unless the Constitutional impediment is clear. We have said many times that "since every presumption favors the validity of a statute, it cannot be stricken down as void, unless it plainly contravenes a provision of the Constitution." *McGlaughlin v. Warfield*, 180 Md. 75, 78, 23 A.2d 12, 13 (1941) and cases cited there; *see also Atkinson v. Sapperstein*, 191 Md. 301, 315, 60 A.2d 737, 742 (1948); *Edgewood Nursing Home v. Maxwell*, 282 Md. 422, 427, 384 A.2d 748, 751 (1978); *State v. Wyand*, 304 Md. 721, 727–28, 501 A.2d 43, 46–47 (1985); *Galloway v. State*, 365 Md. 599, 610–11, 781 A.2d 851, 857–58 (2001). Similar principles apply with respect to striking down otherwise valid contractual provisions as being against public policy. *See Bausch & Lomb v. Utica Mutual*, 330 Md. 758, 790, 625 A.2d 1021, 1037 (1993) ("Maryland courts are reluctant to obviate voluntary bargains on public policy grounds, and to diminish the public interest in having individuals and corporations exercise broad powers as they structure their own affairs"); *see also Finci v. American Casualty*, 323 Md. 358, 378–79, 593 A.2d 1069, 1079 (1991).

 The apparent theory upon which the court declared § 4 of ch. 288 unconstitutional is that, if BCPS is required to

eliminate its $58 million deficit by FY 2006, as the law mandates, it would have to divert funds for that purpose from educational programs and that would exacerbate the Constitutional deficiency found by the court. That was the presumed basis, as well, for declaring the contractual commitment null and void. The same, no doubt, could be said for a hundred other obligations of BCPS, including repayment of the $8 million balance of the loan from the City, which the court expressly required be repaid when due.

What the court overlooked is that § 4 of ch. 288 has an equivalent Constitutional basis under Article VIII of the Constitution. As part of its responsibility for establishing throughout the State a thorough and efficient system of free public schools, the General Assembly has at least the authority, if not an obligation, to ensure that appropriations for educational purposes are managed wisely and, in furtherance of that authority or obligation, to prohibit local school systems from running deficits and, if they do run such deficits, to insist that they be promptly eliminated. Indeed, to continue to permit school systems, through deliberate or negligent conduct, to become fiscally irresponsible and insolvent, as BCPS became, would be a breach of its solemn responsibility to both the children and the taxpayers of the State. As we have observed, BCPS was given a break by the Legislature—a dispensation not given to any other subdivision. Whether any other subdivision might have cause of complaint, there is nothing remotely unconstitutional about § 4 of ch. 288 from BCPS's point of view. The part of the court's order directing BCPS not to comply with that mandate is invalid and void, as is the associated declaration regarding the City Financing Agreement. Because no other aspect of the August, 2004 order, or any other order entered by the Circuit Court to date, is properly before us, we express no opinion with respect to them.[12]

---

12. Given the importance of this case and the fact that it has been pending already for nearly eleven years with no end in sight, at least

PARAGRAPHS 10, 11, AND 13 OF ORDER OF AUGUST 20, 2004 ENTERED BY CIRCUIT COURT FOR BALTIMORE CITY VACATED; COSTS TO BE PAID 3/4 BY APPELLANTS, 1/4 BY APPELLEES.

until 2008, we caution the court to be careful in the kinds of declarations and orders it issues.