*Keith Bradford, et al. v. Maryland State Board of Education,* No. 209, September Term, 2023. Opinion by Eyler, Deborah S., J.

**MARYLAND CONSTITUTION - - ARTICLE VIII RIGHT OF CHILDREN TO THOROUGH AND EFFICIENT FREE EDUCATION - - CONSENT DECREE - - FINAL SETTLEMENT OF DISPUTES AS THEY EXISTED WHEN SUIT WAS FILED AND WITHIN SCOPE OF CONTINUATION OF JURISDICTION AS CONTEMPLATED BY LANGUAGE OF CONSENT DECREE.**

In 1994, parents of several Baltimore City schoolchildren (the "Bradford Plaintiffs") filed suit for declaratory and injunctive relief against the Maryland State Board of Education and the State Superintendent of Schools (collectively, "the State") alleging that children enrolled in the Baltimore City Public School System ("BCPSS") were receiving an education that was so deficient as to violate their right to a free public education under Article VIII of the Maryland Constitution. Eventually, the Board of School Commissioners of Baltimore City and the City of Baltimore were brought into the case, and after a period of discovery, motions for summary judgment were filed. In late 1996, the court granted partial summary judgment for the Bradford Plaintiffs, finding that, on the material facts not in genuine dispute, the children were not receiving a constitutionally adequate education. The court determined, however, that causation - - i.e., which party (or parties) was responsible for the deficient education - - was in genuine dispute and would necessitate a trial. About a month later, the parties entered into a global settlement memorialized in a Consent Decree, which called for a complete overhaul of the management structure of the BCPSS and the Board of School Commissioners of Baltimore City and specified additional funding for the BCPSS, beyond what the legislature ordinarily would provide, from FY 1998 through FY 2002. The Consent Decree provided avenues by which the Bradford Plaintiffs could seek additional funding from the legislature or by direction of the court, for FYs 2001 and 2002, and could seek an extension of the Consent Decree beyond its termination date of June 30, 2002, upon a showing of good cause.

In 2000, the court issued an order determining that the funding in the Consent Decree for FYs 2001 and 2002 was not adequate to remedy the constitutional violation but did not direct any of the defendants to take any action. By then, the General Assembly had created the Thornton Commission, to study and make recommendations about increased State funding for education. In 2002, the court extended the termination date of the Consent Decree, to monitor compliance with its 2000 Order, and in 2004, the court determined that there was a continuing constitutional violation. By then, the Thornton Commission had recommended to the General Assembly additional State educational funding substantially above the 2002 level, to be phased in during FYs 2003 through 2008. In rendering its 2004 ruling, the court stated that it would not tolerate delays in full Thornton funding beyond FY 2008, and when full Thornton funding was achieved, it would revisit whether the Consent Decree should be additionally extended for good cause. The State noted an appeal,

which in 2005 was decided by the Maryland Supreme Court. It found that most of what was contained in the 2004 Order was not final and appealable.

There was no subsequent order entered extending the court's jurisdiction over the Consent Decree, and in fact there was no substantive activity in the case from 2005 until 2019. In FY 2008, full Thornton funding was achieved.

In 2019, the Bradford Plaintiffs filed a petition for further relief, alleging that the Consent Decree had been violated and that the education being provided to Baltimore City schoolchildren remained constitutionally inadequate. The court denied two motions to dismiss by the State and ultimately made a finding on summary judgment of no constitutional violation. This appeal followed.

*Held*: Judgment vacated and case remanded with instructions to dissolve the Consent Decree. The court erred as a matter of law by not granting the State's motion to dismiss. In 1996, all parties to this case agreed to settle their controversies by means of a Consent Decree. A Consent Decree is a contract among the parties and we construe it as we would construe a contract. The Consent Decree had a termination date and circumscribed the court's jurisdiction over it so as to allow the court to extend that date only upon a showing of good cause. It limited the court's authority to direct additional funding to FYs 2001 and 2002. The Consent Decree was meant to end the litigation and provide finality, and its language did not contemplate the court's being in a position to weigh in on the appropriate amount of State educational funding for the BCPSS in perpetuity. And the sole benchmark the court gave, in 2004, for constitutional adequacy was full Thornton funding, which was attained in 2008. In addition, the circumstances affecting the constitutionality of public education in Baltimore City changed substantially after 2008, making the Consent Decree no longer relevant.

The dispute as it existed in 1994 was settled in 1996, and by 2008 there could no longer have been good cause to extend the court's jurisdiction over the Consent Decree, had any such request been made. Nor was there an attempt to prove a violation of the Consent Decree. The request to dissolve the Consent Decree should have been granted. However, if parents of children currently enrolled in the BCPSS are so inclined, they may file a new lawsuit upon allegations of a present violation of the children's constitutional right to a thorough and efficient public education, based on circumstances as they now exist.

Circuit Court for Baltimore City
Case No.: 24-C-94-340058

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 209

September Term, 2023

_____

KEITH BRADFORD, ET AL.

v.

MARYLAND STATE BOARD OF
EDUCATION

_____

Wells, C.J.,
Leahy,
Eyler, Deborah S.
   (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Eyler, Deborah S., J.
Dissenting Opinion by Leahy, J.

_____

Filed: November 12, 2024

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

This appeal arises from litigation initiated thirty years ago over the funding and management of the Baltimore City Public School System ("the BCPSS"). In the Circuit Court for Baltimore City, eight parents of then-current and future BCPSS students ("the Bradford Plaintiffs"), acting on behalf of their children, filed suit against the State.[1,2] They alleged that the education being provided to students in the BCPSS was so deficient as to violate their children's right to a "thorough and efficient System of Free Public Schools" under Article VIII, Section 1 of the Maryland Constitution ("Article VIII"). Subsequently, the suit was consolidated with a similar action by the Mayor and City Council of Baltimore ("the City") against the State.

The circuit court granted partial summary judgment to the Bradford Plaintiffs, ruling that students in the BCPSS were being denied their Article VIII rights. Soon thereafter, the case was settled among all the parties, as memorialized in a comprehensive consent decree ("the Consent Decree"). The settlement required an overhaul of the management structure for the BCPSS and the Board of School Commissioners of Baltimore City ("the Board"), a third-party defendant, and additional funding for the BCPSS over a five-year period. Over the next several years, the court issued three orders regarding the Consent Decree. The last

---

[1] The original plaintiffs were Keith and Stephanie Bradford, Shirley Wiley, Letty Herold, Lawrence Fulton, Roxanne Bartee-El, Janice Smith, and Ramona Piskor. Together, they were parents of nineteen students enrolled in the BCPSS or expected to be enrolled once they reached school age. The parties stipulated that the proposed class would not be certified but that the plaintiffs would be deemed "representative plaintiffs."

[2] The named defendants were the Maryland State Board of Education ("MSBE"), and the State Superintendent of Schools. We refer to the MSBE and the Superintendent collectively as "the State." (The Comptroller and the Governor originally were defendants but were dismissed.)

such order, entered in 2004, was vacated in part by the Supreme Court of Maryland. *Md. State Bd. of Educ. v. Bradford*, 387 Md. 353 (2005) ("*Bradford I*").[3]

Years went by. Then, on March 7, 2019, the Bradford Plaintiffs filed a Petition for Further Relief asking the circuit court to "enforce [its] prior declarations of Plaintiffs' constitutional rights to a 'thorough and efficient' education under Article VIII[.]"[4] The State filed two motions to dismiss, both of which were denied. Ultimately, the court granted the State's motion for summary judgment.

The Bradford Plaintiffs (appellants and cross-appellees) noted an appeal from that judgment and the State (appellee and cross-appellant) noted a cross-appeal. The Bradford Plaintiffs present four questions for review, which we have slightly reworded:

1. Are claims for relief available under the Consent Decree or the Maryland Declaratory Judgment Act?

2. Did the circuit court err by holding that Article VIII "only requires an effort by the State to at most provide a basic education," rather than an "education that is adequate by contemporary educational standards"?

3. Did the circuit court err by granting summary judgment for the State on a record containing reports of egregious facility conditions, low academic achievement, and funding inadequacies?

---

[3] The Supreme Court's opinion in *Bradford I* lays out a detailed procedural history of this case, which we follow in setting forth the necessary background information.

[4] In 1995, before the Consent Decree was entered, the parties stipulated that the original plaintiffs "may substitute additional named plaintiffs as necessary and reasonable if representative plaintiffs become unavailable for reasons beyond their control." Along with the petition for further relief, the Bradford Plaintiffs filed a notice of substitution "designating Stefanie Croslin and Angela Gant to replace some of the prior class representatives."

4. Did the circuit court err by ruling that its power to remedy constitutionally-inadequate school funding is limited by the political question or separation of powers doctrines?

In its cross-appeal, the State poses one primary question, which we have rephrased:

1. Did the circuit court err by denying the State's motion to dismiss or dissolve the consent decree?[5]

We answer, "Yes," to the State's primary question on cross-appeal, vacate the judgment entered on summary judgment, and remand for entry of a judgment dismissing the petition. Given our resolution of that issue, we conclude that the questions raised by the Bradford Plaintiffs on appeal are moot and that it is unnecessary to address the State's alternative questions on cross-appeal.

## FACTS AND PROCEEDINGS

In 1994, the Bradford Plaintiffs, on behalf of "present and future [BCPSS] students" deemed "'at risk' of educational failure," filed suit seeking a declaratory judgment and injunctive relief directing the State "to provide all schoolchildren residing in Baltimore City with an adequate public school education." About a year later, the City sued the State, alleging that underfunding of the BCPSS was depriving the children of Baltimore City of an adequate education. *Bradford I*, 387 Md. at 362.

---

[5] The State poses two additional questions "strictly in the alternative, in the event the matter is remanded to the circuit court":

1. Did the circuit court err in declining to strike Appellants' expert witnesses where their opinions were inherently unreliable?

2. Is the City of Baltimore a necessary party where it was a signatory to the consent decree, is statutorily obligated to provide annual funding to BCPSS, and maintains by statute legal title to all of BCPSS's facilities?

The State filed a third-party complaint against the Board, the Superintendent of City Schools, and the City, alleging that they had "totally failed to manage [the BCPSS]" and that "[a]ny inadequacies in the education received by the children of Baltimore City are a direct result of that failure and can only be remedied by a total restructuring of the management of [the] BCPS[S]."

After the circuit court consolidated the two cases, the parties filed cross-motions for summary judgment. In October 1996, the circuit court granted partial summary judgment in favor of the Bradford Plaintiffs, ruling that children enrolled in the BCPSS were not being provided an education that was "adequate when measured by contemporary educational standards," in violation of Article VIII. However, the court also ruled that there remained a genuine dispute of material fact as to the "cause of the inadequate education" and "liability therefor." Those issues were scheduled for trial.

### The Consent Decree

A little over a month later, on November 26, 1996, the Bradford Plaintiffs, the City, the State, and the Board entered into the Consent Decree, settling the entire case. We summarize its pertinent terms.

The dispute was contextualized in a series of introductory "WHEREAS" clauses. The Bradford Plaintiffs and the Board had sought, and obtained, a declaration that the State was not providing the schoolchildren of BCPSS a thorough and efficient education and, on that basis, were seeking "additional resources to increase student achievement[.]" The State accused the Board of "fail[ing] to manage its existing resources effectively" and sought "reform within [the BCPSS] before additional State funds [were] devoted to [it.]" The

4

parties disagreed as to the causes of and appropriate remedies for the failure to provide an adequate education to BCPSS students but "jointly desire[d] to resolve their differing claims through an amicable settlement in order to provide a meaningful and timely remedy crafted to meet the best interests of the school children of Baltimore City[.]"

In "THEREFORE" clauses, the parties agreed to relief in the forms of restructuring the "[g]overnance and functions" of the BCPSS and requiring "[a]dditional funds" to "be provided by the State to [the] BCPS[S] in Fiscal Years 1998 through 2002."[6]

The body of the Consent Decree covered four main topics: 1) effective dates and term of the Consent Decree; 2) restructuring of management of the BCPSS; 3) review mechanisms; and 4) additional funding for the BCPSS, i.e., beyond what already would be allocated to it. The second topic, which comprises much of the Consent Decree, eventually was completed and is not pertinent to the issues in this appeal.

The Consent Decree's effective date would be triggered by the Governor's signing into law proposed "City-State partnership legislation" and the General Assembly's approval of the FY 1998 State Budget containing the additional funds required by other provisions of the Consent Decree. The Consent Decree would terminate on June 30, 2002, "unless the [circuit court] extend[ed] the term upon timely motion of one of the parties and

---

[6] The parties also agreed that a consent decree entered in pending related federal litigation, *Vaughn G. v. Mayor & City Council of Baltimore*, Civ. Action No. MJG-84-1911, would be incorporated by reference into the Consent Decree. The *Vaughn* litigation was a class action suit filed in 1984 in the United States District Court for the District of Maryland on behalf of students with disabilities living in Baltimore City. The Consent Decree in the case at bar addressed "some issues" raised in *Vaughn*, but that matter finally was concluded in 2012 under the terms of a subsequent settlement agreement.

5

upon a showing of good cause to extend the Decree." The court would "retain[] continuing jurisdiction during the term of th[e] Decree to monitor and to enforce compliance with [its] terms[.]" Any party to the Consent Decree could "seek to enforce [its] terms" and "[n]otwithstanding termination of [the] Decree, the [court] retain[ed] jurisdiction to resolve any disputes that may have arisen during the term of [the] Decree."

The provisions of the Consent Decree governing review mechanisms and directing additional funding were interrelated. The State and the Board agreed that no later than July 1, 1999, they would jointly select and contract with an independent consultant to evaluate reform within the BCPSS, including "the sufficiency of additional funding provided by the State." The consultant would file an interim report by April 30, 2000. The same consultant or a new one jointly selected by the same parties would file a final report by December 1, 2001.

The Consent Decree required the State to provide additional funds to the BCPSS to permit City Schools to implement the "City-State partnership" designed to improve the quality of education provided to students and their academic achievement. The additional funds would supplement State funding already legislatively mandated; they could not be used to "supplant funds provided to or for the benefit of [the] BCPS[S] by the City[.]"

The State agreed to specific funding increases in two areas: instructional programming, which was part of the "per pupil" allocation to the BCPSS, and capital improvement to repair and renovate BCPSS facilities. In the latter category, the State agreed to provide at least $10 million to the BCPSS in FY 1998 through FY 2002, through

6

the Maryland School Construction Program. The City also committed funds to that program, at a share of 10% relative to the State's 90% share.

In the former category, in addition to releasing monies already appropriated but withheld, the State agreed as follows:

> 47. The State shall provide to the Baltimore City Public Schools the following additional funds, subject to appropriation by the General Assembly:
>
> > FY 1998 $30 million
> > FY 1999 $50 million
> > FY 2000 $50 million
> > FY 2001 $50 million
> > FY 2002 $50 million
>
> If these additional funds are not appropriated in any of the designated fiscal years, this entire Decree shall become null and void as of the end of the last fiscal year for which these additional funds were appropriated.

The Consent Decree afforded the Board two pathways for requesting funding above the amounts specified in ¶ 47. First, under ¶ 52, the Board could seek additional funds for FY 1999 through FY 2002 "through the currently established State budget process, if [it] present[ed] a detailed plan showing why such funds are needed and how they would be spent." If it did so, the State would be obligated to "use best efforts to satisfy [it], subject to the availability of funds." Second, under ¶ 53, the Board could seek additional funds for FY 2001 and FY 2002 based upon the findings in the interim report. The Bradford Plaintiffs could weigh in on such a request. If a ¶ 53 request were made, the parties would be required to negotiate over it between April 30, 2000 and June 1, 2000. If that did not result in an agreement, they could "seek relief from the [c]ircuit [c]ourt" by an expedited process that provided for an evidentiary hearing within fifteen days and a right to appeal accorded to

7

the State and the Board. If and only if the Board noted an appeal, the Bradford Plaintiffs also could appeal.

### Events During the Term of the Consent Decree

In April 1997, legislation was enacted codifying the principal terms of the Consent Decree. *See* 1997 Md. Laws, ch. 105. Two years later, the General Assembly created a "Commission on Education, Finance, Equity, and Excellence," which came to be known as the Thornton Commission, after its chairman, Dr. Alvin Thornton. 1999 Md. Laws, ch. 601. The Thornton Commission was tasked with reviewing and making recommendations about "current education financing formulas and accountability measures[.]" *Bradford I*, 387 Md. at 368.

The parties jointly selected Metis Associates, Inc. as the independent consultant charged with completing the interim report. *Id.* at 369. Before that report was issued, the Board, joined by the Bradford Plaintiffs, submitted to the State a proposal for additional funding, entitled "Building on Success: A Remedy Plan to Address Continuing Funding Needs of the [BCPSS]" ("the Remedy Plan"). The Remedy Plan represented that $265 million in additional annual funding and $133 million in additional capital improvements funding were necessary. *Id.* at 368. The Board proposed an interim influx of $49.7 million for instructional programs and $40 million for capital improvements. *Id.*

On February 1, 2000, Metis issued its interim report. It found that $10,274 would be an "adequate" amount of per pupil funding for a student population like Baltimore City's. That amount was $2,698 more than the 1998-1999 per pupil funding for the BCPSS.

8

Consistent with ¶ 53, the Board sought additional funding from the State and the parties began negotiating over this request. No agreement was reached.

In June 2000, the Board filed a petition for further relief in the circuit court in which the Bradford Plaintiffs joined. They asked the court to declare that at least $260 million in additional funding for educational operating expenses was required for each school year and an additional $600 million in capital funding was required "over a reasonable period of time[.]"

The court held an evidentiary hearing and on June 30, 2000, issued a memorandum opinion and order ("June 2000 Order"). It found that the State's funding allocations to the BCPSS for FY 2001 and FY 2002 did not satisfy its obligations under Article VIII and the Consent Decree. The court did not order the State to take any specific action, however. Rather, the court stated that it trusted that the State would "act to bring itself into compliance with its constitutional and contractual obligations under the Consent Decree for the Fiscal Years 2001 and 2002 without the need for [the Bradford] Plaintiffs to take further action."

The State noted an appeal to this Court, but later dismissed it.

In December 2001, a new consultant selected to complete the final evaluation filed its report. *Bradford I*, 387 Md. at 371. It found significant improvement in management of the BCPSS and that per pupil spending for the BCPSS was "now approaching $10,000[.]" *Id.* A month later, the Thornton Commission issued its final report, finding that the per pupil funding for the BCPSS should be increased by between $2,938 and $4,250. *Id.* at 372.

During the 2002 legislative session, the General Assembly enacted "Bridge to Excellence in Public Schools" legislation, known as the "Thornton Act," codifying many of the Thornton Commission's recommendations. *See* 2002 Md. Laws, ch. 288. As pertinent, the Thornton Act provided for phased increases in State educational funding from FY 2003 through FY 2008. *Id.* During that six-year period, the BCPSS would receive $375.2 million in funding beyond the level of funding it received in FY 2002.[7] *Id.*

In May 2002, the Board and the Bradford Plaintiffs filed a motion to extend the term of the court's jurisdiction over the Consent Decree. They argued that because the General Assembly had not identified revenue sources for the funding increases required by the Thornton Act, there was good cause for the court to extend its supervision of the Consent Decree to monitor and enforce compliance with it and with the June 2000 Order.

On June 25, 2002, the court entered a memorandum opinion and order retaining jurisdiction and extending its supervision "until such time as the State has complied" with the court's June 2000 Order ("June 2002 Order").

**Extension of Consent Decree and *Bradford I***

In March 2004, the circuit court directed the parties to the Consent Decree to submit plans to address a budget deficit then facing the BCPSS. *Bradford I*, 387 Md. at 373. The Board and the City responded that the cumulative deficit facing the Board at the end of FY 2003 was $58 million and the Board faced a cash flow shortfall in FY 2004 of $42 million,

---

[7] As set out in *Bradford I*, the specific increases above FY 2002 funding levels were as follows: "FY 2003 $18.7 million; FY 2004 $28.1 million; FY 2005 $68.9 million; FY 2006 $125.5 million; FY 2007 $187.6 million; and FY 2008 $258.6 million." *Bradford I*, 387 Md. at 372 n.6.

which necessitated a loan from the City. *Id.* at 373-74. During the 2004 legislative session, the General Assembly enacted a law prohibiting local school systems from running a deficit. That law set a deadline that applied to all local school systems except Baltimore City. The BCPSS was given a deadline one year from that imposed upon the other local school systems. 2004 Md. Laws, ch. 148. Under that law, the BCPSS would be required to eliminate its deficit by the end of FY 2006. *Id.*

In July 2004, the Bradford Plaintiffs filed a "Motion for Declaration Ensuring Continued Progress Toward Compliance with Court Orders and Constitutional Requirements." They maintained that the Board's plan to terminate its deficit and repay the loan from the City would eliminate programs serving at-risk children. *Bradford I*, 387 Md. at 377. Although they acknowledged that the court could not "directly involve itself in finding solutions to the fiscal problems," they suggested, among other potential solutions, that the court order the State to accelerate the phased-in funding increases called for by the Thornton Act. *Id.* The Board joined the motion. *Id.*

The State responded by filing its own motion asking the court to declare that the funding increases under the Thornton Act satisfied its obligations under the Maryland Constitution, the Consent Decree, and the June 2000 Order. *Id.* at 378.

The court held a four-day evidentiary hearing in late July/early August 2004. On August 20, 2004, it entered a memorandum opinion and order ("August 2004 Order") in which it found a continuing constitutional violation and a continuing violation of the terms of the June 2000 Order that would not be remedied "until the BCPSS receives at least $225

11

million in additional State funding under the Thornton Act by, at the latest, FY 2008."[8] The court observed that it would be "appropriate" for the State to accelerate the funding increases called for under the Thornton Act and warned that it would not "tolerate any delays in full Thornton funding for the BCPSS *beyond FY 2008*." (Emphasis added.) It decided to continue its jurisdiction "to ensure compliance with its orders and constitutional mandates, and to continue monitoring funding and management issues." It stated that when "full funding" was achieved consistent with those terms, the court would "revisit the issue of its continuing jurisdiction, and determine whether the Consent Decree should then be additionally extended for good cause."

The court went on to declare that the provision of the law requiring the BCPSS to eliminate its deficit by the end of FY 2006 was "unconstitutional as applied to the BCPSS" as was a parallel provision in a memorandum of understanding ("MOU") between the City and the Board. It declared that the BCPSS remained responsible for repaying the $8 million balance of its loan from the City, however.

The State noted an appeal from that order and the Supreme Court of Maryland granted *certiorari* prior to review by this Court. *Bradford I*, 387 Md. at 382. On June 9, 2005, the Supreme Court issued its opinion. After detailing the lengthy procedural history of the case and discussing *Hornbeck v. Somerset County Board of Education*, 295 Md. 597 (1983), in which it had interpreted Article VIII, Section 1, the Court held that except for

---

[8] The court stated that State Superintendent of Schools Nancy Grasmick acknowledged in her testimony that Baltimore City needed $225 million "for adequacy as defined by the Thornton Commission."

two rulings in the August 2004 Order that were subject to interlocutory appeal, the order

was not appealable.[9] It reasoned:

> There clearly has been no final judgment in this case. The case is very much alive in the Circuit Court. Indeed, in its August 20, 2004 order, the court has actually done very little of any immediate effect. It declared that the school children in Baltimore City, as of August, 2004, were being deprived of their right to a thorough and efficient education. That determination is certainly subject to challenge if and when a final judgment is entered, if it is still relevant at that time. The court declared that the Constitutional violation would exist until BCPS[S] receives at least $225 million in additional annual aid from the State. That, too, can be challenged, either when a final judgment is entered or at such time as the court attempts to implement that finding by an order that is properly appealable on an interlocutory basis. The court declared that "it would be appropriate" for the State to accelerate the phase-in of additional funding provided in [the Thornton Act]. That is hardly an appealable order. The court decided to retain jurisdiction to continue monitoring funding and management issues. Until the court does something in the exercise of that jurisdiction that is otherwise appealable, however, there is clearly nothing final about that provision.

*Bradford I*, 387 Md. at 385-86.

The only ruling in the August 2004 Order that was immediately appealable *and* was

being challenged by the State was the court's determination that the law and related MOU

requiring local school systems to eliminate their deficits was unconstitutional.[10] This ruling

was injunctive in nature and therefore appealable under Cts. & Jud. Proc. § 12-303(3)(i).

*Id.* at 386-87. On the substance of the challenge, the Court held that the law properly was

---

[9] In *Hornbeck*, the Supreme Court of Maryland held that Article VIII, Section 1 did not require uniformity in funding of local school systems, and so long as the General Assembly established a system that was effective to provide a basic public school education, the then-existing system satisfied that bar.

[10] The directive that the BCPSS repay the $8 million balance of its loan from the City was immediately appealable as an order for the payment of money, *see* Cts. & Jud. Proc. § 12-303(3)(v), but the State was not challenging it. *Bradford I*, 387 Md. at 386.

enacted in exercise of the General Assembly's constitutional authority to ensure a thorough and efficient system of free public schools, which in turn necessitates ensuring that local school systems are fiscally prudent and do not become insolvent. *Id.* at 388. The Court vacated the provisions of the August 2004 Order declaring the law unconstitutional as applied to the BCPSS and voiding the parallel provision of the MOU. *Id.*

## Post *Bradford I*

On October 18, 2005, the circuit court received the Supreme Court's mandate in *Bradford I*. The docket entries show that from then until January 25, 2007, nothing of consequence happened in the case. A few status reports were filed and some attorney appearances were stricken. A motion for contempt was filed by the Bradford Plaintiffs, which the State opposed, but no hearing was held and the motion never was ruled upon.

In FY 2008, Thornton Act funding was fully phased in.

For twelve years, from January 26, 2007 to March 7, 2019, the case lay dormant. There were no filings, rulings, or activity of any kind. In particular, there was no petition for the court to extend its jurisdiction.

## 2019 Petition for Further Relief

On March 7, 2019, the Bradford Plaintiffs filed a Petition for Further Relief seeking to enforce the circuit court's "prior declarations of Plaintiffs' constitutional rights to a 'thorough and efficient' education under Article VIII of the Maryland Constitution." They alleged that, despite the court's declarations that the State had failed to afford BCPSS students with a constitutionally adequate education by providing sufficient funding for instructional programs and school facilities, "State funding for [the] BCPSS has largely

14

stayed flat since FY 2009." Allegedly, the State had taken steps to halt full funding under the Thornton Act at that time, and in FY 2015, a new and increasing "adequacy gap" had emerged, estimated at between $290 million and $358 million. In 2016, the General Assembly had created a new "Commission on Innovation and Excellence in Education" (often called "the Kirwan Commission" after its chairman, Dr. Brit Kirwan), to address educational "funding issues," but the deadline to issue its final report had been delayed two years, from December 31, 2017 to December 31, 2019. The Bradford Plaintiffs asserted:

> The State's lack of funding for [the] BCPSS violates Plaintiffs' constitutional rights as determined by this Court in 2000, 2002, and 2004. This Court expected Defendants to comply with its findings and to fund [the] BCPSS at constitutionally required levels, but the State has ignored those rulings for more than a decade. As the State has made clear that it will not voluntarily adhere to the State Constitution, Plaintiffs return to this Court to seek further relief compelling Defendants to meet their constitutional obligations under Article VIII.

The Bradford Plaintiffs asked the court to find and declare that: 1) the State was violating Article VIII; 2) the State had been in "continuous violation of Article VIII" and had not complied with the circuit court's earlier declaration that, "at a minimum, 'full Thornton funding' is constitutionally required"; 3) the State's current funding of the BCPSS fell below the level of constitutional adequacy; 4) the BCPSS was deprived of $2 billion in necessary financial aid over the "past decades" due to the State's abdication of its responsibilities; 5) "[t]hese constitutional violations will persist until the State of Maryland, including its legislative and executive branches, acts to provide constitutionally adequate funding for educational services in [the] BCPSS and to remedy the effects of its prior constitutional violations;" 6) the State also was violating Article VIII by not providing

15

sufficient resources to ensure that BCPSS facilities were adequate; and 7) these constitutional violations likewise would persist without action by the State's legislative and executive branches.

The Bradford Plaintiffs asked the court to order the State to "comply immediately" with the court's "prior rulings that 'full Thornton funding'" was the minimum necessary funding to achieve constitutional adequacy, with a $290 million shortfall identified by the Department of Legislative Services in FY 2015 as a benchmark, adjusted for inflation. Further, they asked the court to order the State to develop a comprehensive plan for full compliance, subject to court approval, containing certain enumerated information. The "final approved plan" should be "entered as an enforceable judicial decree of the Court along with any additional relief that the Court finds necessary and appropriate" and, if the defendants did not "comply with these orders and decrees," they should be liable for "compensatory damages, including attorney's fees" and penalties necessary to compel compliance.

**First Motion to Dismiss Petition for Further Relief**

In June 2019, the State filed a motion to dismiss the petition. It argued that the petition was time barred or barred by the doctrine of laches; the relief the Bradford Plaintiffs sought was "not authorized by the Consent Decree[,]" which was a final judgment embodying the parties' settlement of the case; the Bradford Plaintiffs were seeking to litigate non-justiciable political questions; and the requests for damages and attorneys' fees were barred by the doctrine of sovereign immunity.

16

After hearing argument, the court denied the motion to dismiss by order entered on January 16, 2020. As pertinent, the court reasoned that because the Consent Decree authorized the Board to request additional funds in excess of those specified in ¶ 47, and allowed the circuit court to retain jurisdiction beyond the termination date upon a showing of good cause, which the court had found in June 2002, the Consent Decree had not terminated, and the circuit court retained jurisdiction to enforce its terms.

**Second Motion to Dismiss Petition for Further Relief**

In November 2021, after the parties had engaged in discovery, the State again moved to dismiss, on two grounds. First, it argued that the issues raised in the petition were rendered moot by the passage of legislation dubbed the "Blueprint for Maryland's Future," 2021 Md. Laws, ch. 36, & 2021 Md. Laws, ch. 55, based on recommendations by the Kirwan Commission, and the Built to Learn Act, 2020 Md. Laws, ch. 20, which significantly increased funding for instruction and capital improvements for the BCPSS. Second, it argued that the Bradford Plaintiffs had conceded in discovery that they were not alleging a violation of any provision of the Consent Decree or of the ancillary orders entered by the circuit court implementing it; therefore, the court lacked good cause to exercise continuing jurisdiction over the Consent Decree. The State asked the court to dismiss the petition and dissolve the Consent Decree.

The Bradford Plaintiffs opposed the motion to dismiss and moved to strike it as untimely and repetitive of the earlier motion. They disagreed that the newly enacted legislation, which would not take effect for several years, mooted the current controversy and denied conceding current compliance with the Consent Decree, emphasizing that they

17

had taken the position that the then-current funding levels violated the court's earlier orders implementing the Consent Decree.

The circuit court denied the State's second motion to dismiss.[11]

**Summary Judgment Proceedings**

Thereafter, the Bradford Plaintiffs, the State, and the City all filed motions for summary judgment. After holding a hearing, the court denied the Bradford Plaintiffs' motion and granted summary judgment in favor of the City and the State. As to the City, the court ruled that because there were no new claims asserted, it was not a necessary party and was entitled to judgment as a matter of law. In the alternative, it ruled that it lacked jurisdiction to grant relief under the Maryland Uniform Declaratory Judgments Action ("MUDJA"), Cts. & Jud. Proc. § 3-409, because there was no final declaratory judgment; that although it had retained jurisdiction to enforce the Consent Decree, it could not grant any relief because the Bradford Plaintiffs had not alleged a specific violation of any provision of the Consent Decree; that there was no continuing constitutional violation under Article VIII because, under *Hornbeck*, the State's only obligation is to provide a basic public school education; and that a request for the court to direct the appropriation of additional funding for the BCPSS is a non-justiciable political question.

This timely appeal followed.

---

[11] The State noted an immediate appeal from that order, which it maintained was an interlocutory order refusing to dissolve an injunction. This Court granted the plaintiffs' motion to dismiss the appeal and the Supreme Court of Maryland denied a petition for writ of *certiorari*.

## DISCUSSION

### a.

As explained, an extension of the term of the Consent Decree only could be granted upon a finding of good cause. In its second motion to dismiss, the State argued that because the Bradford Plaintiffs were not alleging non-compliance with any provision of the Consent Decree or any directive in the June 2000, June 2002, or August 2004 Orders, there could not be a finding of good cause to extend the term of the Consent Decree. Therefore, the court lacked authority to grant any further relief. On that basis, the State asked the court to dismiss the petition for further relief and dissolve the Consent Decree. In its cross-appeal, the State contends the court erred by denying its second motion to dismiss.

We review the denial of the motion to dismiss for legal correctness. *Howard v. Crumlin*, 239 Md. App. 515, 521 (2018). Because we conclude that the court erred as a matter of law by denying the State's second motion to dismiss the Petition for Further Relief, we shall vacate the court's grant of summary judgment and remand the matter to the circuit court to grant the State's second motion to dismiss and enter an order dissolving the Consent Decree.

### b.

"Courts look with favor upon the compromise or settlement of law suits in the interest of efficient and economical administration of justice and the lessening of friction and acrimony." *Chertkof v. Harry C. Weiskittel Co., Inc.*, 251 Md. 544, 550 (1968). "Consent judgments or decrees are essentially agreements entered into by the parties which must be endorsed by the court. They have attributes of both contracts and judicial decrees."

19

*Chernick v. Chernick*, 327 Md. 470, 478 (1992) (citing *Loc. No. 93 v. City of Cleveland*, 478 U.S. 501, 519 (1986)). Significantly, although "a settlement agreement is not a final judgment, a consent order is." *Kent Island, LLC v. DiNapoli*, 430 Md. 348, 359 (2013). "A consent decree memorializes the parties' agreement to relinquish the right to litigate the controversy, 'and thus save themselves the time, expense, and inevitable risk of litigation.'" *Id.* at 360 (quoting *Long v. State*, 371 Md. 72, 82 (2002)).

Because a consent decree manifests a compromise of the parties' competing positions, the intention of the parties is decisive in interpreting the agreement:

> "Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation. Thus the *decree* itself cannot be said to have a purpose; rather the *parties* have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve. For these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it."

*Long*, 371 Md. at 83 (emphasis in *Long*) (quoting *United States v. Armour & Co.*, 402 U.S. 673, 681-82 (1971)). "It is the parties' agreement that defines the scope of the decree." *Id.*

Accordingly, we construe a consent decree under the same rules governing the construction of contracts. *Id.* at 84; *see also O'Brien & Gere Eng'rs, Inc. v. City of Salisbury*, 447 Md. 394, 421 (2016). "[W]hen the language is clear and unambiguous we must presume that the parties meant what they expressed, leaving no room for construction." *Smith v. Luber*, 165 Md. App. 458, 471 (2005) (cleaned up). "To discern the parties' intentions, we look at 'the contents of the document itself and not by consideration

20

of the provisions separately.'" *O'Brien & Gere*, 447 Md. at 421 (quoting *Wheaton Triangle Lanes, Inc. v. Rinaldi*, 236 Md. 525, 530-31 (1964)).

### c.

Against this legal background, we turn to the Consent Decree in this case. As the "Whereas" clauses reflect, after the court granted partial summary judgment in favor of the Bradford Plaintiffs on the issue of constitutional violation, the parties remained at odds about causation and damages, the issues the court found created genuine disputes of material fact. The parties entered into the Consent Decree to settle that controversy by "provid[ing] a meaningful and timely remedy" to BCPSS students, who were at risk of educational failure.

Significantly, the parties agreed to circumscribe the circuit court's jurisdiction over the Consent Decree in several ways. First, the court's jurisdiction "to monitor and to enforce compliance with the terms of this Decree" existed during "the term of this Decree." ¶ 69. Second and relatedly, the court's jurisdiction would terminate on June 30, 2002, the last day of fiscal year 2002, *unless the court found good cause to extend the Consent Decree beyond that date*. ¶ 68. Third, after termination of the Consent Decree, the court retained jurisdiction *only* to "resolve any disputes that may have arisen *during the term of this Decree*." ¶ 69 (emphasis added). Taken together, these provisions permitted the court to intervene if the parties failed to comply with the terms of the Consent Decree or to resolve disputes over its terms but ensured the finality of the parties' agreement to settle the case and forfeit their right to further litigate the underlying constitutional violation.

In ¶ 53 of the Consent Decree, the parties limited the circuit court's authority to order additional funding to Fiscal Years 2001 and 2002. Paragraph 47 listed the minimum amount of funding (beyond that already allocated) the State was required to provide over the five-year term of the Consent Decree. Anticipating that the funds needed might exceed the funding the State expressly agreed to provide in ¶ 47, however, the parties agreed to authorize the Board to request additional funding during the term of the Consent Decree. As pertinent, ¶ 53 provided:

> **For Fiscal Years 2001 and 2002**, the Board may also request funds in amounts greater than those described in paragraph 47, after completion of the interim evaluation[.]

(Emphasis added.) The bolded language limited the Fiscal Years for which the Board could seek supplemental funding. The circuit court's authority to intervene in a dispute over additional funding under ¶ 53A likewise was limited to ruling on the parties' competing positions about the appropriate amount of funding for those two Fiscal Years.

In sum, the court's authority to order additional funding was not indefinite. It was coterminous with the Board's authority to request additional funding for Fiscal Years 2001 and 2002. The court's separate authority under ¶ 68 to extend the term of the Consent Decree for good cause shown did not transmute the additional funding provisions to allow the court to weigh in on the appropriate level of funding for the BCPSS in perpetuity.

**d.**

We now turn to the three orders the circuit court entered regarding the Consent Decree. In the June 2000 Order, consistent with its authority under ¶ 53, the court found that the State's proposed funding allocations for FY 2001 and FY 2002 were below the

22

levels necessary to provide the BCPSS students a constitutionally adequate education. As pointed out in *Bradford I*, however, the court did not direct the State to do anything. 387 Md. at 370 (noting that the order was "essentially hortatory"). It merely stated that it trusted that the State would "act to bring itself into compliance with its constitutional and contractual obligations under the Consent Decree for the Fiscal Years 2001 and 2002 without the need for [the Bradford] Plaintiffs to take further action."

In its June 2002 Order, pursuant to ¶ 68 of the Consent Decree, the court found good cause to extend the decree's term for the purpose of "monitor[ing] and enforc[ing] compliance with [the court's] June 2000 Order." As noted, the June 2000 Order itself was limited to a finding that the State's funding for the BCPSS in Fiscal Years 2001 and 2002 was not adequate. Thus, in June 2002, the court ruled that the State had not yet provided additional, necessary funding that had been requested in 2000 pursuant to ¶ 53.

In its August 2004 Order, the court decided to continue its jurisdiction "to ensure compliance with its orders and constitutional mandates, and to continue monitoring funding and management issues." It declared that adequate funding would not occur until the State provided the BCPSS additional funding of $225 million by FY 2008, i.e., full Thornton funding. That was the sole benchmark for compliance the court gave. It stated that when full Thornton funding was achieved it would "revisit the issue of its continuing jurisdiction, and determine whether the Consent Decree should then be additionally extended for good cause." As we have recounted, the August 2004 Order was appealed but in 2005 the Supreme Court found most of it to be non-appealable.

Nothing of any consequence happened after the case was remanded by the Supreme Court. As counsel for the Bradford Plaintiffs acknowledged at oral argument before this Court, in FY 2008, Thornton Act funding was fully phased in. At that point, the court's only declared standard for what it considered to be adequate additional funding for FY 2001 and FY 2002, albeit not achieved until FY 2008, was satisfied. At no time thereafter did the Bradford Plaintiffs (or any party) ask the circuit court to "revisit the issue of [the court's] continuing jurisdiction, and determine whether the Consent Decree should then be *additionally extended* for good cause." (Emphasis added.) The court's wording makes clear that it did not consider itself to have extended the term of the Consent Decree indefinitely. And beyond that, it is easily explainable why the parties never sought to revisit continuing jurisdiction. Given that full Thornton funding had been achieved, they had to have recognized that good cause to further extend the Consent Decree no longer existed.

By entering into the Consent Decree, the Bradford Plaintiffs gave up their right to litigate a continuing constitutional violation in exchange for achieving short term measurable increases in funding for the BCPSS. The circuit court's jurisdiction was circumscribed by the terms of the Consent Decree and, absent a finding of good cause to further extend the circuit court's jurisdiction, its authority to act terminated.

**e.**

The Consent Decree was entered almost twenty-eight years ago, the circuit court issued its last substantive order twenty years ago, and full Thornton funding was reached sixteen years ago. Eight years ago, the legislature formed the Kirwan Commission to address and make recommendations about "funding issues" affecting the BCPSS. The

24

Kirwan Commission's work spanned from its formation in 2016 until 2020, when its final report was issued. By then, approximately 75,000 students were enrolled in the BCPSS, twenty-five percent less than in 2000. In 2021, the General Assembly passed legislation dubbed the "Blueprint for Maryland's Future," 2021 Md. Laws, ch. 36, & 2021 Md. Laws, ch. 55, based on the Kirwan Commission's recommendations. The year before that, the General Assembly passed the "Built to Learn Act," 2020 Md. Laws, ch. 20, which increased funding for instruction and capital improvements for the BCPSS.

The Bradford Plaintiffs' Petition for Further Relief, filed in 2019, is premised on the circuit court's 1996 finding that the State was violating BCPSS students' educational rights under Article VIII but does not allege a violation of the Consent Decree, which was entered into as a consequence of and as a remedy for that finding. Rather, in language rooted in the present day, it urged the court to "compel [the State] to comply with their constitutional obligations to provide an adequate education to Baltimore City school children consistent with contemporary education standards." They alleged that funding for the BCPSS had remained relatively "flat" since FY 2009; that a 2013 evaluation found BCPSS facilities to be decrepit; and that the Kirwan Commission's work, which was finished a year after the petition was filed, had been delayed.

The 1996 finding of an Article VIII violation and the Consent Decree meant to remedy that violation were anachronous by the time the Petition for Further Relief was filed, and remain so. As noted, in its August 2004 Order, the circuit court contemplated that if, after reaching the full Thornton funding benchmark, the Bradford Plaintiffs still contended that constitutional inadequacy existed and provided good cause to further extend

25

the court's jurisdiction, they would make that request. Despite their assertion decades later that soon after reaching full Thornton funding, funding flattened, they did not seek continuation of jurisdiction from the circuit court. They did nothing, and the case became dormant.

The circumstances that led to the decades-old finding of constitutional inadequacy and the Consent Order intended as a remedy belong to that era and exist now as historical context. They are unconnected other than by history to present conditions in the BCPSS and any question whether, at this point in time, students are receiving a constitutionally adequate education under Article VIII. There is no link between the circumstances that underlay 1995 through 2004 and the question whether, at this time, students in Baltimore City are receiving an adequate education and if not, the appropriate remedy. The Consent Decree, settling all matters relating to the court's original finding of inadequacy, was time-bound, not intended to exist in perpetuity, was satisfied according to the August 2004 Order by full Thornton funding, and was in a state of finality that the Bradford Plaintiffs did not challenge and did not have good cause to challenge. The parties did not enter into a perpetual Consent Order, and the term of the Consent Order has ended.

Whether BCPSS students are not receiving a constitutionally adequate education under Article VIII is a question the Bradford Plaintiffs (or other parents of current or future students) may litigate by filing a new action. They may not, however, resurrect a claim they settled in 1996 by means of the Consent Decree, the terms of which ended by necessity in 2008, was never extended, and cannot now be extended. *See Kent Island, LLC*, 430 Md. at 360 (explaining that parties to a consent decree "relinquish the right to litigate the

26

controversy" to "save themselves the time, expense, and inevitable risk of litigation" (cleaned up)).

For all these reasons, the circuit court erred by denying the State's motion to dismiss the Petition for Further Relief. Accordingly, we shall vacate the order granting summary judgment in favor of the State and remand with instructions for the circuit court to enter an order dismissing the Petition for Further Relief and dissolving the Consent Decree.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY VACATED. CASE REMANDED FOR THAT COURT TO ENTER AN ORDER DISMISSING THE PETITION FOR FURTHER RELIEF AND DISSOLVING THE CONSENT DECREE. COSTS TO BE PAID BY THE APPELLANTS.**

27

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 209

September Term, 2023

_____

KEITH BRADFORD, ET AL.

v.

MARYLAND STATE BOARD OF
EDUCATION
_____

Wells, C.J.,
Leahy,
Eyler, Deborah S.
   (Senior Judge, Specially Assigned),

JJ.
_____

Dissent by Leahy, J.
_____

Filed: November 12, 2024

I respectfully dissent. Little has changed in terms of the reasons for the initial Consent Decree—Baltimore City schools still fail to provide an adequate education as measured by contemporary educational standards. I agree with the Majority that significant time has passed since the most recent legal action related to the Consent Decree, and that State and federal governments have passed new laws in the intervening years that affect the structure and funding of the Baltimore City Public School System ("BCPSS"). However, because the children in Baltimore City public schools still do not receive the "thorough and efficient" education they are guaranteed under Article VIII of the Maryland Constitution, the consent decree should be modified rather than dissolved. Accordingly, I would reverse the circuit court's grant of summary judgment, rather than vacate it as the majority does.

## I.

The Baltimore City school children and their families that sued the Maryland State Board of Education ("MSBE") in 1994 alleged that they were being denied the right to a "thorough and efficient education" guaranteed by Article VIII of the Maryland Constitution. In 1996, although the parties disagreed about the ultimate cause for the deficiencies of BCPSS, they entered into a consent decree "to meet the best interests of the school children of Baltimore City." The Consent Decree noted that "the public school children in Baltimore City are not being provided with an education that is adequate when measured by contemporary educational standards," and that the parties "jointly desire[d] to resolve their differing claims through an amicable settlement in order to provide a

meaningful and timely remedy crafted to meet the best interests of the school children of Baltimore City."

Article VIII, Section 1, of the Maryland Constitution requires that the General Assembly "establish throughout the State a thorough and efficient System of Free Public Schools; and shall provide by taxation, or otherwise, for their maintenance."  The Supreme Court, in dicta, has stated that the "thorough and efficient" clause of Article VIII requires that each school district "provide an adequate education measured by contemporary educational standards."  *Hornbeck v. Somerset Cnty. Bd. of Educ.*, 295 Md. 597, 639 (1983).[1]  This interpretation is in line with the courts of other states with similar constitutional provisions.  *See, e.g.*, *DeRolph v. State*, 677 N.E.2d 733, 736, 744-45 (Ohio 1997) (Constitutional provision requiring a "thorough and efficient system of common schools" requires at least "a safe and healthy learning environment" and that children be "educated adequately so that they are able to participate fully in society."); *Leandro v. State*, 488 S.E.2d 249, 255 (N.C. 1997) (A "sound basic" education allows a child to "participate fully in society as it exist[s] in his or her lifetime."); *Claremont Sch. Dist. v.*

---

[1] The Court also observed, that to "conclude that a 'thorough and efficient' system under § 1 means a full, complete and effective educational system throughout the State . . . is not to require a statewide system which provides more than a basic or adequate education to the State's children."  *Hornbeck,* 295 Md. at 632.  It has been observed that "[a] system that produces barely literate graduates cannot possibly satisfy the 'thorough and efficient' or 'basic or adequate' requirements—nor can a system in which thousands of students fail to graduate at all."  Susan P. Leviton & Matthew H. Joseph, *An Adequate Education for All Maryland's Children: Morally Right, Economically Necessary, and Constitutionally Required*, 52 Md. L. Rev. 1137, 1161 (1993).

*Governor*, 703 A.2d 1353, 1359 (N.H. 1997) ("A constitutionally adequate public education" extends beyond "[m]ere competence in the basics [of] reading, writing, and arithmetic[.]").

I disagree with the Majority's statement that the Bradford Plaintiffs' 2019 petition "does not allege a violation of the Consent Decree[.]" *Bradford v. Maryland State Bd. of Educ.*, No. 0209, Sept. Term 2023, slip op. at 25 (majority opinion). The petition alleged, among other things, that "[t]he State . . . has abdicated its duty under Article VIII to provide funding sufficient to ensure that students in the City attend schools in buildings that are safe, functional, have reliable heating and air conditioning, and have sufficient facilities to support and adequate education program[,]" and that "[t]he State's lack of funding for BCPSS violates Plaintiffs' constitutional rights as determined by this Court in 2000, 2002, and 2004."[2]

The voluminous record and the briefs present staggering evidence in support of the Bradford Plaintiffs' contention that children who attend many Baltimore City public schools do not receive an education that is adequate by contemporary standards. The studies and expert reports link the conditions in which children learn to their educational

---

[2] Although the Bradford Plaintiffs stated in response to an interrogatory that their petition did not allege "the violation of specific terms of the Consent Decree," they also stated that the petition alleges "ongoing violations of Article VIII of the Constitution of Maryland," and that the circuit court's continuing jurisdiction is consistent with the terms of the court's August 2004 Order and multiple paragraphs in the Consent Decree. As explained *infra*, in my view, the funding requirements under the Consent Decree were in service of the broader goal of curing the State's ongoing Article VIII violation, and the requirements could be amended on that basis. As a result, alleging an ongoing violation of Article VIII would be sufficient to allege a violation of the Consent Decree.

3

outcomes, and the overall conditions in Baltimore City public schools are exceptionally poor. Out of approximately 160 school buildings, only fourteen have working water fountains. Ninety-seven schools have inadequate electrical systems. Student accounts describe vermin infestations—including mice, rats, and cockroaches—in their classrooms. Eighty-nine school facilities require a complete overhaul to meet minimally acceptable standards.

As described in an expert report, well-maintained school facilities lead to improved school attendance and better academic outcomes, while substandard buildings impair student engagement and learning. In 2019, the State reported that 17.9% of BCPSS elementary students were proficient in Math, and 18.6% were proficient in English Language Arts ("ELA"); 13.5% of middle school students were proficient in Math, and 22.7% were proficient in ELA; and 21.8% of high school students were proficient in Algebra I, and 32.9% were proficient in ELA 10. BCPSS students scored lower in math and reading than students in all but a handful of other large school districts nationwide. Proficiency rates are even lower for students with disabilities: according to BCPSS data, only 5% of students with disabilities met or exceeded expectations in math or language arts. In sum, although I recognize that the State has directed enormous resources to BCPSS over the years, and that there are many reasons for the deplorable conditions in which Baltimore City school children must learn, it is still the case—as it was in 1996—that the conditions are intolerable and must be addressed by all parties, including the State, as mandated under Article VIII.

## II.

To be sure, the Majority does not suggest that the children in Baltimore City are currently receiving the "thorough and efficient education" guaranteed by Article VIII of the Maryland Constitution. The point on which the Majority and I disagree pertains to the scope of the Consent Order. More specifically, I disagree with the Majority's conclusion that the Consent Decree "limited the circuit court's authority to order funding to Fiscal Years 2001 and 2002." Maj. Op. at 22. By its terms, the Consent Decree was not limited to FY 2002 or "full Thornton funding." As explained above, in my view, the goal of the Consent Decree was to provide Baltimore City students with "an education that is adequate when measured by contemporary educational standards." The Consent Decree provided for a consultant who was empowered to make recommendations concerning, among other things, "the need for funding *in excess of the amounts provided herein* in order for [BCPSS] to provide its students with an education that is adequate when measured by contemporary educational standards." (Emphasis added). And the court was permitted to extend the term of the Consent Decree "upon timely motion of one of the parties and upon a showing of good cause to extend the decree." Although the specific terms of the Consent Decree were focused on Fiscal Years 2001 and 2002, the court's authority to extend the terms of the Consent Decree necessarily implies the authority to require additional action if the funding level in those fiscal years proved inadequate.[3]

---

[3] The Majority emphasizes that the case lay dormant for many years—twelve—because the Bradford Plaintiffs did not file any motions or petitions to extend the circuit court's jurisdiction. Maj. Op. at 22. I agree with the Majority that the Bradford Plaintiffs'

(continued)

This broad authority is reflected in the circuit court's order dated August 20, 2004, in which the court found that "[t]he students in Baltimore City . . . still are not receiving an education that is adequate when measured by contemporary educational standards," and declared, among other things, that "[f]unding sufficient for the BCPSS to achieve constitutional adequacy will not occur until the BCPSS receives at least $225 million in additional State funding by, at the latest, FY 2008." On appeal, the Supreme Court of Maryland held that this portion of the circuit court's order was only a pronouncement, not a final judgment, because "the case is very much alive in the Circuit Court." *Maryland State Bd. of Educ. v. Bradford*, 387 Md. 353, 385 (2005). The Court instructed that the circuit court's determination could be challenged "if and when a final judgment is entered[.]" *Id.* In my view, the circuit court's August 2004 Order was consistent with its authority to extend the Consent Decree and monitor and enforce compliance with its terms—including the requirement that the State provide funding sufficient "for [BCPSS]

---

failure to file any motions in the case between January 2007 and March 2019 is not consistent with their argument that the State failed to meet its constitutional obligations, even after full funding under the Thornton Act. The Bradford Plaintiffs address this, however, by saying that they were engaged in "consistent and extensive legislative advocacy" during this period, while funding requirements to meet the State's obligation under Article VIII continued to increase.

Neither the Majority, nor I, suggest that the Bradford Plaintiffs waived their arguments. Indeed, there are a number of cases in other states where consent decrees lay dormant for well over a decade. *See, e.g.*, *Borel ex rel. A.L. v. Sch. Bd. Saint Martin Par.*, 44 F.4th 307, 311 (5th Cir. 2022) (addressing consent decree in school desegregation case pending for "over five decades"); *Smith v. School Bd. Concordia Par.*, 906 F.3d 327, 330, 337 (interpreting "decades-old" consent decree on school desegregation); *United States v. Junction City Sch. Dist.*, 14 F.4th 658, 662 (8th Cir. 2021) (evaluating proposed modification of 1990 consent decree in desegregation case). The Majority correctly bases its determination on the language of the Consent Decree—I simply disagree with the Majority's reading of the Consent Decree.

6

to provide its students with an education that is adequate when measured by contemporary educational standards."

## III.

Finally, I would apply the test used by federal courts in other "institutional reform" cases to hold that the Consent Decree should be modified, rather than dissolved. On appeal, the State argues that the Consent Decree should be dissolved because (1) the Bradford Plaintiffs conceded a lack of jurisdiction, and (2) because intervening legislation has mooted the petition. Neither of these arguments are persuasive. First, as explained above, the circuit court has authority to extend the consent decree "upon a showing of good cause," and, in my view, the Bradford Plaintiffs properly alleged an ongoing violation of the Consent Decree. Second, intervening legislation only moots a case when the legislation effectively ends the ongoing controversy. *See, e.g.*, *Am. Bar Ass'n v. F.T.C.*, 636 F.3d 641, 645-47 (D.C. Cir. 2011) (amendment to law exempted lawyers from regulation, ending dispute); *Hill v. Snyder*, 878 F.3d 193, 204 (6th Cir. 2017) (plaintiffs excluded from application of challenged statute); *Naturist Soc., Inc. v. Fillyaw*, 958 F.2d 1515, 1520 (11th Cir. 1992) ("[A] superseding statute or regulation moots a case only to the extent that it removes challenged features of the prior law."). In this case, the Bradford Plaintiffs have submitted evidence that, despite intervening legislation such as the "Blueprint for Maryland's Future," the State is continuing to violate Article VIII by failing to provide an adequate education to Baltimore City students. Therefore, the case is not moot.

Federal courts have a substantial history of "institutional reform litigation," in which plaintiffs seek to cure illegal government practices such as school segregation, deficient

English language learning programs, and inhumane prison conditions. *See* Mark Kelley, Note, *Saving 60(B)(5): The Future of Institutional Reform Litigation*, 125 Yale L.J. 272, 275 (2015). The Supreme Court has formulated a two-step test for evaluating requests to modify consent decrees in these cases. *See id.* at 286. First, the moving party bears the burden to show a significant change in circumstances since the decree was entered. *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 383 (1992). Second, the change in circumstances must make enforcement of the existing decree substantially more onerous, render the decree unworkable due to unforeseen conditions, or make enforcement of the decree detrimental to the public interest. *Id.* at 384. The burden to dissolve a consent decree is higher: it is "well-established" that to dissolve a consent decree, the moving party must show "*both* (1) that the decree's objects have been 'attained,' *Frew [ex rel. Frew v. Hawkins]*, 540 U.S. [431], 442, 124 S.Ct. 899 [(2004)], *and* (2) that it is unlikely, in the absence of the decree, that the unlawful acts it prohibited will again occur." *Horne v. Flores*, 557 U.S. 433, 492 (2009) (Breyer, J., dissenting).

Under the federal test, the Consent Decree should not be dissolved because evidence in the record suggests that its objects have not been attained,[4] and in the absence of the Consent Decree it is highly likely that the State will continue to violate Article VIII. The goal of the Consent Decree was to provide Baltimore City students with "an education that is adequate when measured by contemporary educational standards." As described above,

---

[4] I should point out that I view the objects of the Consent Decree as not having been attained because I read the goal of the Consent Decree more broadly than the Majority as to provide Baltimore City students with "an education that is adequate when measured by contemporary educational standards."

evidence in the records shows that Baltimore City public schools remain deficient in several areas, including facility maintenance and student performance scores. In my view, to dissolve the Consent Decree at this point would be to declare victory prematurely—the Consent Decree should be dissolved when the ongoing violation of Article VIII of the Maryland Constitution is fully cured.

There is a strong argument, however, that the Consent Decree should be modified because the legislation passed in the years since the Consent Decree was entered represent a significant change in circumstances. While the Bradford Plaintiffs' 2019 petition was pending, the General Assembly enacted the "Blueprint for Maryland's Future" and the "Built to Learn Act." The "Blueprint for Maryland's Future" instituted extensive educational reforms, created a new system of oversight, changed the way State and local governments determine annual school funding, and increased State funding for Maryland public schools. And the "Built to Learn Act" added new funds for school construction, in addition to other injections of federal funding. All these changes would make it substantially more onerous to apply the Consent Decree in its current form because the Consent Decree's terms are focused on a now-outdated funding and management structure. Therefore, I would reverse the circuit court's grant of summary judgment and remand with instructions to modify the Consent Decree in light of intervening legislation.

**Conclusion**

The situation before us is best summarized in the words of Chief Justice Wilentz of the Supreme Court of New Jersey in an opinion holding, over thirty years ago, the 1975

Public School Education Act unconstitutional under the New Jersey Constitution's thorough and efficient clause:

> After all the analyses are completed, we are still left with these students and their lives. They are not being educated. Our Constitution says they must be.
>
> Included in our perspective are the stories of success. They show that the urban poor are capable, that given sufficient attention in an adequately financed system using the best knowledge and techniques available, a thorough and efficient education is achievable.
>
> This record proves what all suspect: that if the children of poorer districts went to school today in richer ones, educationally they would be a lot better off. Everything in this record confirms what we know: they need that advantage much more than the other children. And what everyone knows is that—as children—the only reason they do not get that advantage is that they were born in a poor district. For while we have underlined the impact of the constitutional deficiency on our state, its impact on these children is far more important. They face, through no fault of their own, a life of poverty and isolation that most of us cannot begin to understand or appreciate.

*Abbott by Abbott v. Burke*, 575 A.2d 359, 412 (N.J. 1990).

There is no question the consent decree evinces a desire by all the parties to see the children who attend Baltimore City Schools fully enjoying an adequate education as soon as possible. And, without a doubt, the State has been very generous with the time and resources it has dedicated toward the goal of providing Baltimore City school children the "thorough and efficient education" they are guaranteed under Article VIII of the Maryland Constitution. But we are left with the sobering fact that the goal has yet to be achieved, and I fail to see how requiring the Bradford Plaintiffs to file a new lawsuit will serve the best interests of the children, the City, the State, or judicial economy.

The correction notice(s) for this opinion(s) can be found here:

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/cosa/0209s23cn.pdf